Hollis **WATKINS**, et al., Plaintiffs,

v.

Ray **MABUS**, Governor of the State of Mississippi, Mike Moore, Attorney General of the State of Mississippi, and Dick Molpus, Secretary of State of the State of Mississippi, Members of the State Board of Election Commissioners, Mississippi Democratic Party Executive Committee, and Mississippi Republican Party Executive Committee, Defendants,

The Standing Joint Legislative Committee on Reapportionment of the Mississippi Legislature; Tim Ford, In His Official Capacity as Speaker of the House of Representatives; Glenn S. Deweese, In His Official Capacity as President Pro Tempore of the Mississippi Senate; and the Standing Committee of Apportionment and Elections of the Mississippi House of Representatives, Intervenor Defendants.

Civ. A. No. J91–0364(L).

United States District Court, S.D. Mississippi, Jackson Division.

Aug. 9, 1991.

Affirmed in Part and Vacated in Part Nov. 12, 1991. See 112 S.Ct. 412.

Carroll Rhodes, Hazlehurst, Miss., John L. Walker, Tomie Green, Jackson, Miss., Wilbur O. Colom, Columbus, Miss., Deborah McDonald, Fayette, Miss., for plaintiffs.

John R. Dunne, Gerald W. Jones, Attys., Voting Section, Civ. Rights Div., Dept. of Justice, Washington, D.C., for amicus curiae U.S.

Jim Warren, Waycaster & Warren, Jackson, Miss., for Miss. Democratic Party Executive Committee.

Michael B. Wallace, Phelps Dunbar, Jackson, Miss., for Miss. Republican Party Executive Committee.

John Reeves, Jackson, Miss., for House Standing Committee.

Daniel E. Lynn, Asst. U.S. Atty., Jackson, Miss., amicus curiae.

Stephen J. Kirchmayr, Giles W. Bryant, Asst. Attys. Gen., Jackson, Miss., for Governor and State of Miss.

Bill Allain, Hubbard T. Saunders, IV, Champ Terney, Jackson, Miss., for intervenors.

William Harold Jones, Petal, Miss., for Standing Committee Miss. House of Representatives and Frances Savage.

J. Dewayne Thomas, Jackson, Miss., Oliver G. Diaz, Jr., Biloxi, Miss., Thomas Upton Reynolds, II, Charleston, Miss., Standing Committee Representatives.

Before BARKSDALE, Circuit Judge, LEE and PICKERING, District Judges.

PER CURIAM:

As noted in this court's orders of August 2 and 8, 1991, this opinion provides the bases for those orders. The August 2 or-

der concerns the 1991 elections for the Mississippi Legislature being held on schedule. The August 8 order denies plaintiffs' motions to stay the August 2 order and enjoin the elections, pending appeal of the August 2 order.

Challenging Mississippi's current legislative apportionment (1982 plan), as well as that adopted by the Mississippi Legislature in 1991, plaintiffs seek injunctive and other relief under §§ 2 and 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, *et seq.*, and the Fourteenth and Fifteenth Amendments to the United States Constitution. The primary and general elections for the Mississippi Legislature are scheduled for September 17 and November 5, 1991, respectively; and plaintiffs seek, *inter alia*, to have those elections held under a court-ordered, or court-approved, plan, with the persons elected to hold office for a regular four-year term, or a shorter term set by this court.

For the reasons stated below, and as ordered on August 2, 1991, the requested relief is GRANTED IN PART and DENIED IN PART.

By motions on August 5 and 6, plaintiffs moved to stay the August 2 order and enjoin the elections, pending their appeal of the August 2 order. As ordered on August 8, 1991, those motions are DENIED.

## I.

In 1982, the Mississippi Legislature adopted its present apportionment, with 122 districts for the House and 52 for the Senate. Miss.Code Ann. § 5-1-1, *et seq.*

Pursuant to § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, the 1982 plan was submitted to the United States Attorney General for preclearance and became effective on November 22, 1982, when the United States Attorney General did not, within the prescribed 60-day period, interpose an objection to the plan. 1982 Miss.Laws ch. 306 § 1; ch. 305, § 1. Accordingly, the elections for the Mississippi Legislature in 1983 and 1987 were held pursuant to that plan. Under the 1982 plan, there are approximately 20 split precincts for the House plan and 4 for the Senate plan.

According to the 1990 census, the State of Mississippi has a total population of 2,573,216, of whom 1,633,461 are white (63.-48%), and 915,057 are black (35.56%). Therefore, for a 122 member House and 52 member Senate, each House and Senate district ideally should contain 21,092 and 49,485 persons, respectively. Accordingly, based upon the number of persons now residing in the 1982 plan districts, the existing districting scheme (the 1982 plan) for the House has a total population deviation from the norm of 110.124%, with district 58 being overpopulated by 55.81% and district 51 being underpopulated by 54.43%. Likewise, the Senate now has a total population percentage variation from the norm of 42.-31%, with district 30 being overpopulated by 24.92% and district 22 being underpopulated by 17.39%.

In November 1979, Mississippi amended Article 13, § 254 of its Constitution to provide for reapportionment following the decennial census.[1] Although the Mississippi

---

1. Article 13, § 254 provides in part:

   The legislature shall at its regular session in the second year following the 1980 decennial census and every ten (10) years thereafter, and may, at any other time, by joint resolution, by majority vote of all members of each house, apportion the state in accordance with the constitution of the state and of the United States into consecutively numbered senatorial and representative districts of contiguous territory. The senate shall consist of not more than fifty-two (52) senators, and the house of representatives shall consist of not more than one hundred twenty-two (122) representatives, the number of members of each house to be determined by the legislature. Should the legislature adjourn, without apportioning

itself as required hereby, the governor by proclamation shall reconvene the legislature within thirty (30) days in special apportionment session which shall not exceed thirty (30) consecutive days, during which no other business shall be transacted, and it shall be the mandatory duty of the legislature to adopt a joint resolution of apportionment. Should a special apportionment session not adopt a joint resolution of apportionment as required hereby, a five-member commission consisting of the chief justice of the supreme court as chairman, the attorney general, the secretary of state, the speaker of the house of representatives and the president pro tempore of the senate shall immediately convene and within one hundred eighty (180) days of the adjourn-

Legislature was not required by § 254 to reapportion the Legislature until 1992 ("second year following the 1980 decennial census and every ten (10) years thereafter"), the Legislature, as noted above, reapportioned itself in 1991, the year after the census. Miss.J.R. No. 4 (1991) and Miss.J.R. No. 202 (1991). The defendant Standing Joint Legislative Committee on Reapportionment of the Mississippi Legislature (Joint Committee), instead of the Mississippi Attorney General, was charged with submitting the 1991 plan to the United States Attorney General for § 5 review, with the resolutions providing that until the plan was precleared, it did not become law. The submission was completed on June 24, 1991.

By letter of July 2, noting expedited review of the submission, the United States Attorney General interposed an objection, addressing several illustrative aspects in the plan that caused him to find that the State had not met its burden of showing that the plan was free of a racially discriminatory purpose. However, he "note[d] at the outset that the proposed districting plans for both the House and the Senate appear to have no retrogressive effect within the meaning of Section 5. Both plans maintain or expand the number of districts in which minority voters usually will be able to elect legislators of their choice...."

Based on his analysis of the legislative proceedings leading to adoption of the 1991 plan, the Attorney General stated that "currently black citizens do not have an equal opportunity to elect candidates of their choice to either the Mississippi House or Senate." He was unable to say that the plan was free of any racially discriminatory purpose, finding "that reasonably compact and contiguous districts could be drawn in a number of additional areas of the State in which black voters usually would be able to elect representatives of their choice." The Attorney General stated that he could not "ignore the substantial indications in the materials and information available to us

... that support for the [1991 plan] and opposition to alternative suggestions were sometimes characterized by overt racial appeals." The Attorney General concluded:

> We are mindful that the regularly scheduled elections for the Mississippi House and Senate are fast approaching. We understand that for elections to go forward under a plan which satisfies both the legitimate concerns of the Mississippi Legislature and the requirements of federal law will require a concerted effort. Please be assured that this Department stands ready to cooperate in every way, including providing review under Section 5 on an exceptionally expedited basis so that the scheduled elections might be held with a legally enforceable plan under the existing schedule.

Between submission of the 1991 plan and the Attorney General interposing his objection, plaintiffs filed this action, challenging both the 1982 and 1991 plans. Named as defendants were Mississippi's Governor, Attorney General, and Secretary of State— the members of the State Board of Election Commissioners (State Defendants); the Mississippi Democratic Party Executive Committee (Democratic Party); and the Mississippi Republican Party Executive Committee (Republican Party). Plaintiffs amended the complaint to incorporate the July 2 objection by the United States Attorney General.

On July 10, the Joint Committee, the Speaker of the Mississippi House and the President Pro Tempore of the Mississippi Senate moved to intervene; and intervention was allowed *ex parte*. Plaintiffs on July 12 moved the court to reconsider that intervention; and the court did so on July 15, when it, among other things, considered the July 12 motion to intervene by the Standing Committee on Apportionment and Elections of the House of Representatives (House Committee). (As discussed *infra*, that Committee's apportionment plan for the House had failed by a vote of 64 to 58.

ment of such special apportionment session apportion the legislature, which apportionment shall be final upon filing with the office

of the secretary of state. Each apportionment shall be effective for the next regularly scheduled elections of members of the legislature.

Among other things, it had the support of all 20 black members of the House.)

By order on July 15, this court noted that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court", *citing McDaniel v. Sanchez*, 452 U.S. 130, 138, 101 S.Ct. 2224, 2230, 68 L.Ed.2d 724 (1981), and emphasized that sufficient time remained for the Governor of Mississippi to convene a special session of the Legislature and for a new plan passed by that special session to be precleared by the United States Attorney General.[2] This court then, *inter alia*, (1) enjoined the July 19, 1991, qualifying deadline; (2) allowed the Joint Committee to remain as a defendant; (3) allowed the House Committee to intervene as a defendant; (4) allowed the United States to participate as *amicus curiae;* (5) ordered the parties on or before July 19, 1991, to submit recommendations for a special master or a court-appointed expert witness; and (6) ordered that, if the Mississippi Legislature did not enact and have a new plan precleared, (a) the parties on or before July 24, were to submit proposed redistricting plans, memoranda, affidavits and other supporting papers, including a statement concerning the propriety *vel non* of injunctive relief, (b) the United States on or before July 26, was to file any response to the proposed plans, and (c) a hearing was to be held on Monday, July 29.

A July 18 order scheduled a status conference for July 22, including provision for the parties to participate if desired, and a pretrial conference for July 26.

Following the July 22 status conference, the parties on July 24 filed those items ordered on July 15, including proposed plans and memoranda. The State Defendants, the House Committee, and the Democratic and Republican Parties did not file separate plans. The Joint Committee filed a plan (July 23 plan) that consisted of the plan the Legislature passed (April 30 plan) with modifications to cure the Attorney General's objections. Plaintiffs submitted several plans on July 24, and were allowed additional time to submit additional plans. At the pretrial conference on July 26, and pursuant to pretrial and court-appointed expert witness orders for the July 29 hearing, discussed at the conference and entered following it, the plaintiffs were directed to designate the plan for each chamber that they desired the court-appointed expert witnesses to review, with their designated House plan to be filed on or about 5:00 p.m. on Friday, July 26, and their Senate plan on or about 10:00 a.m. on Saturday, July 27.[3] The court-appointed expert witness order stated, pursuant to agreement by the State Defendants and House Committee, that those plans so designated by plaintiffs were adopted by the State Defendants and the House Committee. The pretrial order also provided that the July 29 hearing would concern, *inter alia*, whether elections were to be timely held, including whether under the 1982 plan, and the length of term of office pursuant to such elections.

The expert witness order, discussed and agreed to at the pretrial conference, directed the court-appointed experts to: (1) comment on the objections by the United States Attorney General to the 1991 plan and the extent to which the July 23 Joint Committee plan cured those objections; and (2)

---

**2.** The Mississippi Legislature meets annually in regular session beginning on the Tuesday after the first Monday of January for a period of 90 calendar days, except that the regular session which begins on every fourth year after 1972 runs for a period of 125 calendar days. Miss. Const. art. 4, § 36. In the spring of 1991, the immediately preceding regular session of the Mississippi Legislature adjourned until the Tuesday after the first Monday of January 1992 "unless sooner convened by the Governor" of Mississippi. *Id.* "The governor shall have the power to convene the legislature in extraordinary session whenever, in his judgment, the

public interest requires it." Miss.Const. art. 5., § 121.

**3.** Plaintiffs contend that their designated plan for the House (July 26 least change plan) offered the minimum number of changes from the April 30 plan that would cure the Attorney General's objections. Likewise, they offered their Senate plan (July 27 least change Senate plan) as a plan with changes from the legislatively-approved plan designed to cure the § 5 objection.

analyze the July 23 plan submitted by the Joint Committee and the designated plan to be submitted by plaintiffs (on their behalf and on behalf of the State Defendants and House Committee) on the following bases— population deviation; black majority districts (ranges of 50% to 54.99%, 55% to 59.99%, 60% to 64.99%, and 65% and above); districts lacking compactness apparently due to political or racial reasons; House districts containing two or more counties; and split counties (Senate only), precincts and municipalities.

Pursuant to the schedule set by the expert witness order, the experts provided their reports to counsel on Sunday, July 28, subsequent to counsel for the Joint Committee and plaintiffs advising the court late that afternoon that they were close to settlement on the House plan and were negotiating the Senate plan.

At the start of the July 29 hearing, plaintiffs announced that they and the Joint Committee had reached settlement on the House plan and were close to settlement on the Senate plan, with only districts 20 (in Madison County) and 22 (in Washington County) still in dispute. The Department of Justice announced that plans submitted to it that day could be reviewed by Thursday, and if they were agreed plans, the review could take place more quickly. However, the House Committee then announced that it had not adopted the plan submitted by plaintiffs on July 26 and that it had not taken part in the July 27–28 negotiations. The Democratic Party made no announcement; the Republican Party stated that it had no objection to the settlement of the House plan and wanted the elections to be held on schedule, with the candidates being elected to a four year term. The State Defendants did not make an announcement; and the Court recessed until 1:00 p.m., to allow the parties to attempt to reach settlement on plans for both chambers.

When Court reconvened, the Mississippi Attorney General, for the State Defendants, stated that they, like the House Committee, had, in fact, not adopted the plans submitted by the plaintiffs on July 26

and 27 and were uneasy about the proposed settlement. Among other things, the Attorney General noted concern expressed to him by the circuit clerks over split precincts. The plaintiffs then advised again that the plaintiffs and the Joint Committee had reached agreement on a House plan; but for the Senate, they could not reach agreement because of one district in dispute in the Delta that plaintiffs wanted as a black majority district. They indicated that negotiations over that district necessarily involved negotiations over adjoining districts. Moreover, although the Joint Committee and plaintiffs stated that they had reached settlement, their agreement was not in a form ready for submission to the United States Attorney General, but simply reflected the black majority districts on which they had agreed. The House Committee then interposed another objection to the House plan the plaintiffs had submitted and served on July 26, noting that the certificate of service for that plan did not reflect service on the House Committee.

The court advised the parties of its great, and ever increasing, concern, in light of the fast approaching elections and numerous conflicts among the parties, including the defendants, and noted the numerous administrative tasks to be completed before the primary election, as well as items of other, and greater significance, such voter confusion. It observed that the Democratic Party had stated that the qualifying deadlines should be no later than August 9. The court reiterated, as it had in the pretrial order, that the only option under the circumstances might be to hold the elections under the 1982 plan; and court was recessed until the next day (July 30), to allow the parties further time to attempt to reach settlement. The plaintiffs then filed a motion for a preliminary injunction against use of the 1982 plan.

On July 30, the plaintiffs reported that they had prepared in map and statistical form the agreement on the House reached in principle with the Joint Committee (the July 29 House plan). The Joint Committee estimated that the July 29 House plan was substantially equivalent—approximately

70% to 75%—to the plan the Mississippi Legislature passed. However, the State Defendants and House Committee stated again that they were not in agreement on that July 29 plan.[4] The House Committee urged the court to adopt its plan (July 11 plan), a modification of the above noted alternate plan that the House had failed to pass by a vote of 64 to 58 during the regular legislative session. The United States estimated that if the July 29 House plan were submitted that day (Tuesday) for preclearance, the Attorney General could render a decision by Thursday (August 1). The plaintiffs and Joint Committee indicated that no agreement had been reached on the Senate, but that there were only one or two districts still in dispute.

The court encouraged the parties to continue settlement discussions; it advised, however, that, regardless of the progress the parties made toward settlement, its order establishing a scheme for the 1991 elections would be issued on August 2. It submitted the July 11 and July 29 plans to the court-appointed experts for review, based on the criteria outlined in the July 26 expert witness order, and directed them to testify about the various plans on the following day (July 31). It likewise requested that the parties offer election officials' testimony concerning the problems associated with conducting elections on an abbreviated schedule. The court again stressed that the only viable alternative might be to conduct interim elections for one year, utilizing the 1982 plan.

Also on July 30, plaintiffs offered the testimony of Dr. Allan J. Lichtman, who opined that, in order for black citizens in Mississippi to elect representatives of their choice, they would need to vote in a district with a black population of 68.5% and a black voting age population greater than 60%.[5] Dr. Lichtman agreed that voter turnout, especially for voters of a lower socioeconomic status, was likely to be less in special elections than in regularly scheduled elections, and that longer campaigns are more helpful to voters with less access to information and few economic resources.

In the hearing on July 31, the parties indicated that they had not reached a settlement on either the House or the Senate to which all parties could agree. The only firm agreement was the July 29 House plan between the Joint Committee and the plaintiffs. The court-appointed experts— Hoyt T. Holland, Jr.,[6] and William J. Little, Jr.—testified regarding their analysis of the April 30 legislative plan, the July 23 Joint Committee plan, the plaintiffs' July 26 (House) and 27 (Senate) plans, the July 11 House Committee plan and the July 29 (House) settlement plan. They identified the number of districts for each plan that "lack[ed] compactness to the extent that it appears that the District was drawn to achieve, without being malapportioned, either a political or racial result." Neither could state that the proposed plans cured the Attorney General's objections based on discriminatory purpose. Little testified that the July 29 settlement plan did not go further than the July 23 Joint Committee plan in curing the Attorney General's objections, except possibly in the Leflore

4. In commenting on the course of negotiations over the July 29 plan, the parties offered conflicting reports. In contrast to the House Committee stating that it had not taken part in, or agreed to, the July 29 House plan, the plaintiffs contended that members of the House Committee had participated in the negotiations. The plaintiffs also maintained that they had reached an agreement on the Senate on July 29 but that they could not locate the person(s) with whom they had agreed.

5. Dr. Lichtman qualified his analysis by stating that the required black population and voting age population percentages vary from county to county and that the data also varies for blacks under age 25. He likewise indicated that a

smaller black majority is needed in urban areas than in rural parts of Mississippi in order for black voters to have an equal opportunity to elect candidates of their choice. His testimony on socioeconomic disparities between whites and blacks in Mississippi was primarily based on data accumulated as of 1984. However, in 1988, for example, the Mississippi Legislature enacted laws to make voting registration easier.

6. On July 29, the day after the experts issued their original reports, the plaintiffs moved to strike Holland's report on the grounds that Holland was unqualified and biased. Following voir dire of Mr. Holland and argument by plaintiffs on July 31, the motion was denied.

County districts. Little indicated that, in general, the considerable changes effected by the July 29 plan with respect to the July 23 plan did not appear to be based on concerns for improving minority representation.[7]

Both Holland and Little identified as a defect in the 1991 (April 30) plan the fact that it included groups of persons, such as university student populations, within the districts, who do not normally vote in those districts.

Little did not offer a judgment as to which plan was best, although he did note that the July 11 plan had a lower deviation than the July 29 plan and that it better promoted minority representation.

Holland indicated that he would require 3 or 4 days to draw his own redistricting plan for the Legislature, assuming that the court provided him with criteria, such as the number of black majority districts the plan should contain. Little testified that he would need 3 to 6 weeks for each chamber to draw a plan, depending on the difficulty of the criteria the court supplied him. This estimate did not include time for input from the public or the parties.

Also testifying on July 31 were several circuit clerks from various legislative districts in Mississippi who described the considerable logistical problems involved in conducting elections with a delayed qualifying deadline. They also testified that conducting elections with a large number of split precincts would significantly complicate the voting process. Henry Kirksey testified as to disparities in education and income between black and white voters in Mississippi. And, Janiki Hall offered expert testimony in support of the plaintiffs' July 27 least change Senate plan.

On August 1, Representative, and plaintiff, Ed Blackmon, a member of the Joint Committee, the House Committee, and the Black Caucus,[8] testified in favor of plaintiffs' July 26 least change plan for the House. Blackmon testified that, during the legislative session, black legislators had struck a bargain with 38 other representatives to support the alternate plan that failed on the floor of the House. The 58 representatives agreed that black members would receive the maximum number of black majority districts possible and would not become involved in the partisan, political fight over the next House speaker. Blackmon criticized the activities of the House Committee and Joint Committee during the legislative session, stating that there were "no clean hands in this." He testified that, subsequent to the Legislature's adjournment, power politics had motivated the changes in the two plans originally before the Legislature; he indicated that the Joint Committee and House Committee had each endeavored to protect those who supported their respective plans. He also noted that compactness in drawing the districts had not been honored.

The State Defendants, the Republican Party, the Democratic Party, and the Joint Committee did not call witnesses. The House Committee offered the testimony of Representative Ayres Haxton, who had worked with Representative Blackmon in creating the alternate plan that was rejected during the legislative session. Haxton testified that Blackmon had insisted on the inclusion of 40 majority black districts in the alternate plan. He outlined the ways in which the July 11 plan (a modification of the alternate plan that lost in the House) attempted to cure seven problem areas raised by the United States Attorney General's objection letter. While Haxton indicated that, in creating the July 11 plan, the House Committee had attempted to pursue a "least change" approach with respect to the plan that failed in the House, he testified that the Committee nonetheless mod-

---

7. Little noted that the Joint Committee's July 23 plan lowered the percentage deviation with respect to the April 30 plan. In doing so, it approximately doubled the number of split precincts. Little suggested that it would be easier to draw a legislative redistricting plan once the county supervisors' districts—currently in the process of being reconfigured—are redrawn because it would be necessary to split fewer precincts.

8. The Black Caucus is composed of the 20 black members of the Mississippi House and the two black members of the Mississippi Senate.

ified 71 districts in order to lower deviations and cure the Attorney General's objections. Haxton testified that the failure of the various proposals to create reasonably compact districts was due in part to political considerations, rather than merely attempts to maximize the number of black majority districts.

At the request of some parties, additional time was given during the hearing on August 1 to reach settlement. Settlement was not reached, and oral argument was presented the afternoon of August 1.

Late in the morning on August 2, the court held another status conference, in which it urged counsel to attempt to reach a settlement for both chambers of the Mississippi Legislature. Three minutes before court was to commence at 3:30 p.m. that day, plaintiffs advised that a settlement had been reached for the House. However, in court, plaintiffs, the Joint Committee, and the House Committee announced that a completed settlement agreement, in the form of a plan, would not be ready for 48 hours; and that if problems developed in reaching settlement, there was no binding arbitrator. And, counsel again advised the court that no agreement had been reached for the Senate, nor did it appear that one would be reached. The State Defendants repeated their desire that the elections be held on schedule. And, counsel for the executive committees for both political parties urged that the court take action that day, so that the elections could be timely held; that if there was an agreement on the House, it should be dictated into the record and completed that day. However, it was not possible for the settlement to be entered in a form that would clarify the points on which the parties had agreed; and this court concluded that it would be inequitable to the candidates and the voters, among others, to further delay the election process. Moreover, with settlement reached only on the House, but not on the Senate, special elections for the Senate would still be necessary.

Thereafter, the court entered its August 2 order, which provided in part:

1. The apportionment plan to be utilized for the September 17 primary election and November 5 general election for the Mississippi Legislature will be the apportionment plan now in effect (1982 plan), Miss.Code Ann. § 5-1-1, *et seq.*, which was submitted to the United States Attorney General for preclearance, pursuant to § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and became effective on November 22, 1982, when the United States Attorney General did not, within the prescribed 60–day period, interpose an objection to the plan, as advised by a letter of November 22, 1982, on behalf of the United States Attorney General. 1982 Miss.Laws ch. 306 § 1; ch. 305, § 1.

2. The qualifying deadline for the 1991 legislative elections is Monday, August 12, 1991, at 5:00 p.m.

3. Those persons elected pursuant to 1991 legislative elections shall hold office until their successors are elected under an apportionment plan which complies with the Voting Rights Act and the United States and Mississippi Constitutions. That plan will be effected either by (a) a legislative plan, precleared by the United States Attorney General or approved by a three-judge court in the District of Columbia, 42 U.S.C. § 1973c, or (b) ordered by this court.

4. This court retains jurisdiction of this action. Further proceedings will take place as ordered, including, but not limited to, the following:

a. On February 14, 1992, the parties are to submit nominees, including their qualifications, for appointment as a special master, pursuant to Fed.R.Civ.P. 53. The parties have through February 28, 1992, to file objections to those nominees.

b. A status conference will be held in this action on March 2, 1992, at 1:30 p.m.

5. Solely for the September 17 primary election for the Mississippi Legislature, and because of the extended qualifying deadline, the following changes to certain election procedures shall be in effect:

a. The Democratic and Republican Party State Executive Committees shall

mail or otherwise make available official sample ballots to their respective county executive committees in accordance with their customary practices, no later than Thursday, August 15, 1991. Those sample ballots will be utilized by the county executive committees without revision.

b. Qualified absentee voters shall be allowed to vote at their respective circuit clerk's office until 12:00 noon on Monday, September 16, 1991.

c. Absentee ballots mailed to the circuit clerk shall be accepted and counted if they are received by mail in the office of the circuit clerk on or before 5:00 p.m. on September 17, 1991.

d. In order to allow absentee ballots to be mailed at the earliest possible date, the circuit clerks may print absentee ballots in a form or size which is different from the regular official ballot, provided that the absentee ballots are in the same order of arrangement as the regular official ballot.

e. If necessary, voting may be by paper ballots, with the paper ballots to be used in combination with the voting devices utilized for the conduct of all other elections on September 17. This order does not authorize the use of paper ballots for other elections scheduled for September 17, 1991.

6. If further similar changes in election procedures are necessary for the September 17 primary election for the Mississippi Legislature, they shall be requested forthwith on motion to United States District Judge Tom S. Lee, the managing judge in this action.

On August 5 and 6, plaintiffs moved to stay the August 2 order and enjoin the elections, pending appeal of the order. The State Defendants, House Committee and Republican Party filed responses in opposition to the motions. The motions were denied on August 8.

## II.

■ As the parties recognize, the 1991 plan is not in issue; because it has not been precleared, it has no effect. 42 U.S.C. § 1973c. This was, among other things,

recognized by the resolutions adopting the 1991 plan. Miss.J.R. No. 4 at p. 27 (1991) and Miss.J.R. No. 202 at p. 19 (1991).

The Legislature bears first responsibility for reapportioning itself and should be given time to enact a plan of reapportionment. *E.g., Wise v. Lipscomb*, 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); *Chisom v. Roemer*, 853 F.2d 1186, 1192 (5th Cir.1988), *rev'd on other grounds,* —— U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). The Legislature having failed to do so, however, we are called upon to decide whether the elections will be held; and if so, whether under a plan adopted by the court, under a plan submitted by one of the parties, or under the existing districting scheme (1982 plan).

In this instance, this court operates as a court of equity. *E.g., Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423, 1432–33 (8th Cir.1989) (citing 1982 U.S.Code Cong. & Admin.News 208). We are charged with fashioning interim relief pending later legislative or, if necessary, judicial action. *See Monroe v. City of Woodville, Miss.*, 819 F.2d 507, 511 n. 2 (5th Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). We proceed to consider the alternatives available to us for holding elections and to balance the equities for and against the adoption of each.

### A.

Before addressing either the propriety of a court-drawn plan or adopting a plan proposed by one of the parties, we note the troubling political winds that have unfailingly roared through the courtroom at every turn of this litigation. Needless to say, these have an adverse bearing on any plan that this court could either fashion or adopt. They can not be ignored. They are a warning light for any plan.

Shifting alliances among some parties consistently made a resolution by settlement difficult, if not impossible. One factor that deterred negotiation is the disagreement by the House Committee and the State Defendants, represented by the Mississippi Attorney General, with the

plaintiffs, with whom they were formerly in agreement, as noted above. As noted, at the hearing on July 15, the House Committee stated its disagreement with the Joint Committee concerning the plan for the House. The April 30 plan for the House passed the House by a close vote of 64 to 58; it became apparent at the hearings that this split was, among other things, part of the ongoing contest for Speaker of the House—a pure political controversy, that can be given no consideration by this court. But, as noted, it sounds an alarm.

And, as indicated at the hearing commencing July 29, the alliance between the plaintiffs and the State Defendants and House Committee came to an abrupt end at or about the time of the July 26–27 negotiations, which took place principally between the Joint Committee and the plaintiffs. Another alarm sounded loud and clear.

Likewise, another controversy vividly outlined by the hearings is the ongoing dispute between the Mississippi Legislature and the Mississippi Attorney General.[9] For example, the Mississippi Attorney General made it clear that the State Defendants had no input in the negotiations following the submission of the 1991 plan to the United States Attorney General. This, again, is another political controversy which, like the dispute between the Joint Committee and the House Committee— with the plaintiffs moving from one side to the other, has no bearing in this court. We note again only that these disputes, among other things, have precluded a possible settlement of this action on the Senate side and made it impossible to create a House plan in map and statistical form that would have facilitated a genuine agreement among the parties. A genuine settlement on the two houses might have resulted in a plan that the United States Attorney General could have precleared and that this court could have adopted.

And, as noted, these disputes have enlightened the court, to say the least, on the need for even more than the usual detailed, painstaking and cautious fact finding in fashioning or adopting a plan.

### 1.

However, time does not permit this court to fashion its own plan. To do so would require considerable proof, as well as drawing districts after the proof was received and considered. In order to develop a fair plan, we would need to receive input from all the parties and from the public. Because we find that the interests of the voters mandate holding elections on time, we conclude that we lack sufficient time to conduct full hearings and use a special master to draw plans that take into account the diverse interests at stake in this litigation. For example, in order for this court to fashion a plan, we would have to furnish to the master or court-appointed expert the criteria to be used in developing new districts. Time does not permit this court to develop the proper criteria. To do so, we would need to establish a baseline black voting age population figure for use in shaping majority black districts. Testimony adduced at the hearing demonstrated that it would be improper to use the same population percentages state-wide. It would be necessary for this court to receive extensive—and current—proof in order to develop the proper criteria for creating majority black districts in various regions of Mississippi.

As to the alternative of freezing current legislators in office, it would not be fair to the voters, much less the present legislators, to require them to continue to hold office. We are especially concerned over the prospect of denying voters the right to choose the representatives of their choice four years after the last set of legislative elections. Moreover, at the hearing on this matter, most parties agreed that they would prefer on-time elections under *any* plan rather than freezing current legislators in office.

### 2.

Not having time to draw our own plan, we turn to those proposed by the parties. In starting, we note the concerns expressed

---

**9.** This is, in part, reflected by the fact that the Joint Committee, not the Mississippi Attorney General, made the submission of the 1991 plan to the United States Attorney General.

by the United States Attorney General in his July 2 objection letter.

Moreover, the reports prepared by the court-appointed experts demonstrate serious problems with the plaintiffs' designated plans (July 26 [House] and July 27 [Senate] plans), the Joint Committee plan (July 23 plan), the plaintiff-Joint Committee settlement plan (July 29 plan), and the plan that originally failed on the House floor, as modified (July 11 plan). And, analysis of the plaintiffs' designated House plan was rendered difficult by the fact that their submitted data were incomplete.[10]

For example, viewing the proposed Senate plans, the Joint Committee's has a deviation of 3.14%, but the plaintiffs' July 27 least change plan has a deviation of 8.66%; the Joint Committee's has 26 split precincts, while the plaintiffs' plan has only two. Both plans have districts that are not compact.[11]

The plans submitted by the parties for the House suffer from the same problems. While the Joint Committee plan has a deviation of only 1.97%, the plaintiffs' July 26

least change plan has a deviation of 16.-24%.[12] We note that the population deviation in later plans increased over earlier ones as the parties attempted to accommodate political considerations and to create more majority black districts. As noted, a number of proposed districts in each of the submitted plans are not reasonably compact.[13] The inclusion of a large number of significantly non-compact districts in all the proposed plans before the court is of great concern; the suggestion, if not expression, of political, not merely racial, jockeying in configuring these districts is patent. The court is reluctant to adopt, even on an interim basis, any of these plans so filled with little disguised political "landmines", as termed by counsel for one of the parties.

Despite the Supreme Court's pronouncements that a court-ordered redistricting plan should utilize the portions of a legislative plan that do not violate the Constitution or Voting Rights Act, e.g., *Upham v. Seamon*, 456 U.S. 37, 43, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982), we decline to

---

**10.** The plaintiffs designated House plan lacked precinct data, the omission of which made it difficult for the court-appointed expert to calculate population deviation for that plan. Accordingly, plaintiffs revised that submission by providing additional data on August 1.

**11.** The Joint Committee's (July 23) proposed Senate District 16 resembles a pinwheel in shape. Senate District 18 lacks compactness: it consists of a rectangular district with a long appendage attached that extends northward. District 29 resembles a barbell, with two groupings of precincts attached by a narrow alley. Districts 37 and 38 are essentially daisy chains of precincts, each with one or more peninsulas of precincts that extend out into adjoining districts.

In the plaintiffs' designated Senate plan (July 27 plan), District 19 resembles a boomerang, with two long groupings of precincts joined at a single point. Plaintiffs' Senate Districts 20 and 37 randomly attach ameoba-like extensions of precincts.

**12.** The data plaintiffs submitted on August 1 was to correct this. The July 11 plan has a deviation of 2.98%, and the July 29 plaintiff-Joint Committee settlement plan has a deviation of 9.68%.

**13.** The court-appointed experts testified that the following numbers of districts lacked compact-

ness in the respective plans: July 23 Joint Committee, 15; July 26 plaintiffs' least change, 12; July 11 alternate plan as modified, 18; July 29 plaintiffs-Joint Committee settlement, 20. An examination of the non-compact districts identified in the experts' reports indicates some particularly strangely shaped districts. House District 13 proposed by the Joint Committee resembles a half-oval. The Committee's District 36 contains two masses of precincts connected by a narrow alley. House Districts 47 and 48 in the Joint Committee plan consist of narrow arms shooting out from a reasonably compact center. The plaintiffs plan (July 26) maintains the same bizarrely configured House District 13. Although it contains fewer non-compact districts than the Joint Committee's proposed House plan, it nonetheless risks confusing voters and fracturing communities of interest by including oddly-configured districts, including House Districts 21, 22, 33, 35, 41, 48, 56, 38, 93, 99, and 107. The July 11 plan contains non-compact districts that consist of octapus-like arms jutting out from a central core, e.g., House Districts 43 and 89. The July 29 compromise plan again maintains the oddly-configured House District 13, along with the sickle-shaped District 32. It preserves districts with long, narrow bands of precincts jutting outward into other districts, e.g., Districts 33 and 48. District 66, referred to at trial as the "dumbbell" or "barbell" district, contains two mirrored groupings of precincts, connected by a narrow alley, the "bar."

adopt the Joint Committee Plan. Based on the testimony of the expert witnesses and the United States' July 26 negative response to the plan, we conclude that the Joint Committee failed to show that its plan cured the objections interposed by the United States Attorney General.

Moreover, it is clear to this court that the settlement plan concluded by the Joint committee and plaintiffs contains changes, different from the plan adopted by the legislature, primarily for the purpose of defeating a member, or members, of the rival House Committee. Likewise, some of the changes involved in converting the plan that failed in the House to the July 11 plan were made for purely political reasons.

Based on testimony from the circuit clerks, the court also perceives a number of logistical problems in adopting the submitted plans because of the number of split precincts they contain. For example, the Joint Committee House plan splits 130 precincts; the plaintiffs' plan splits 77. The July 11 plan splits 139 precincts; and, in order to achieve a settlement between the plaintiffs and the Joint Committee, the July 29 plan splits 166 precincts. As discussed *infra*, the Supreme Court has recognized the logistical problems involved in precinct splitting as a rationale for not adopting a submitted plan for interim use. We note further that using existing law (the 1982 plan) will require splitting fewer precincts than would be required by any of the submitted plans. This court is wary of the great potential for voter confusion caused by use of any of the submitted plans.

Furthermore, if the court adopts a plan submitted by one or more of the parties, that plan will reflect legislative policy choices. Therefore, preclearance would still be required by the United States Attorney General. *See, e.g., McDaniel*, 452 U.S. at 153, 101 S.Ct. at 2238. The United States Attorney General has advised that review would be expeditious; but review, of whatever length, will require submission of supporting data and result in delay.

Finally, given the original goal of all parties to conduct elections as scheduled, we conclude that any order this court is-

sued after August 2 to establish election procedures would be too late. It would not give candidates enough time to decide whether to run; it would not give those charged with elections enough time to prepare; and it would not give voters adequate opportunity to familiarize themselves with their districts and their candidates.

### B.

Accordingly, if elections are to be timely held, they must be held pursuant to existing law—the 1982 plan. Obviously, to not hold the elections on September 17 and November 5 would have an unacceptable adverse impact on the citizens of Mississippi. We find that it is preferable to hold elections on the dates already set for state elections. Conducting special elections after this court has had time to draw its own plan would lead to a lower voter turnout and extra expense for the State, at a time when the court can take judicial notice of extreme budgetary constraints under which Mississippi, like numerous other States, is operating. Further, the 1982 plan has the advantage of having been adopted by the entire Legislature. It has not been modified by a few legislators, as here, after the Legislature adjourned.

At the hearing, most of the parties agreed that the best course was to hold elections on time, even if it meant using the 1982 plan. The State Defendants emphasized that elections should be held on time, including, if need be, under the 1982 plan. The Republican Party and Democratic Party favored on-time elections under any equitable plan, including the 1982 plan. The House Committee preferred elections under the 1982 plan if the July 11 plan were not used.

Plaintiffs seek, including through their July 29 motion, to enjoin the use of the 1982 plan. They contend that this court may not order its use, on the ground that it is unconstitutionally malapportioned. They also contend that the 1982 plan dilutes black voting strength in violation of § 2 of the Voting Rights Act. We address each of their objections in turn.

### 1.

■ The plaintiffs object to use of the 1982 plan on the ground that it violates the principle of one-person, one-vote that the Supreme Court has derived from the Fourteenth Amendment equal protection clause. To be sure, the principle of one-person, one-vote is a bedrock principle of voting rights jurisprudence in this country. As stated in *Gray v. Sanders,* 372 U.S. 368, 379–80, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963):

> Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions.

And as stated in *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964):

> We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both Houses of a bicameral State Legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for State legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.

■ But, for obvious reasons, this principle does not—and indeed cannot—require absolute, mathematical exactness. *E.g., Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2695, 77 L.Ed.2d 214 (1983). There can not be total equality, or equal weight, for every vote. Moreover, it is clear that, because of the swiftness with which population can shift and the high cost of creating new election districts, a state may conduct elections for a reasonable amount of time with districts whose deviations are higher than constitutionally optimal. For example, the House Committee noted that the legislative districts in Mississippi have been malapportioned for a number of years since the 1980 census.

A simple example demonstrates the impossibility of equalizing with mathematical exactness voting strength between various districts. The population for a given geographical unit includes all persons residing within it, whether they are eligible to vote. For example, for equal districts of 20,000 persons, if only 10,000 vote in one district (District A), but 18,000 vote in the other (District B), then a vote in District B has far less weight than a vote in District A. In *Hadley v. Junior College Dist. of Metro Kansas City, Mo.,* 397 U.S. 50, 54, 90 S.Ct. 791, 794, 25 L.Ed.2d 45 (1970), the Supreme Court stated that "[t]his Court has consistently held in a long line of cases, that in situations involving elections, the States are required to ensure that each person's vote counts as much, *insofar as it is practicable,* as any other person's." (Emphasis added.)

Here, with the imminent elections and lack of available options, it is constitutionally permissible to utilize the 1982 plan in fashioning interim relief. The Supreme Court has at times "authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements." *Upham,* 456 U.S. at 44, 102 S.Ct. at 1522 (citations omitted). The Court has cited "necessity" as the motivating factor in those instances. *Id.* Even in *Reynolds,* the case so often cited for the principle of one-person, one-vote, the Court acknowledged that a court, faced with an illegal apportionment on the eve of an election, may adopt interim plans that would not pass constitutional or statutory muster if adopted on a permanent basis:

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is al-

ready in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.

377 U.S. at 585, 84 S.Ct. at 1394.

It is certainly not a novel principle that a district court, faced with the evils of either disrupting state government or ordering interim relief that falls short of constitutional standards, must sometimes adopt an unconstitutional election system on a temporary basis. In *Connor v. Williams*, 404 U.S. 549, 550–51, 92 S.Ct. 656, 658, 30 L.Ed.2d 704 (1972), for example, the Supreme Court refused to invalidate the results of a Mississippi election even assuming it was held in violation of the one-person, one-vote principle. In *Kilgarlin v. Hill*, 386 U.S. 120, 121, 87 S.Ct. 820, 821, 17 L.Ed.2d 771 (1967), the Supreme Court stated: "We affirm the District Court's action in permitting the 1966 election to proceed under H.B. 195 although constitutionally infirm in certain respects."

The Fifth Circuit, in reviewing a district court's decision to hold elections using an at-large seat instead of constitutionally preferable single-member districts, approved the use of an at-large seat. *Corder v. Kirksey*, 639 F.2d 1191, 1196 (5th Cir. 1981), *cert. denied*, 460 U.S. 1013, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983). It cited as an important factor "the short time [the district court] possessed to fashion a fair remedy in the face of an impending election." *Id.* at 1195. The exigent circumstances the district court faced "dictated the use of the at-large plan as a matter of constitutional expediency." *Id.*

Given the impossibility of crafting a judicial plan in advance of an imminent election, courts have responded in various ways to the need to fashion an emergency remedy. In *Ely v. Klahr*, 403 U.S. 108, 113, 91 S.Ct. 1803, 1806, 29 L.Ed.2d 352 (1971), for example, the Court affirmed a district court's decision to conduct elections under a constitutionally infirm legislative plan in a situation where the district court "could not itself devise a new plan without

delaying primary elections...." The Supreme Court mentioned specifically that the district court declined to adopt the plaintiff-appellant's plan "since it was based on census tracts, rather than the existing precinct boundaries, and 'the necessary reconstruction of the election precincts could not be accomplished in time' to serve the 1970 election, whose preliminary preparations were to begin in a few weeks." *Id.* at 111–12, 91 S.Ct. at 1805 (quoting the district court opinion). The situation facing this court is analogous to that in *Ely*; adopting any of the plans proposed by the parties would involve considerable time-consuming alteration in election precincts and voting procedures. And while we would not permit precincts to be configured so as to restrict the opportunities for minority candidates to elect the candidates of their choice, we know of no controlling case law requiring massive splitting of precincts in reapportionment.

In *Terrazas v. Clements*, 537 F.Supp. 514 (N.D.Tex.1982) (three judge court), the court responded to exigent circumstances created by the Attorney General's refusal to preclear a legislative plan by adopting, as an interim measure, the rejected legislative plan combined with modifications taken from one of the plaintiffs' plans. In deciding which alternative plan to adopt, the court in *Terrazas* analyzed the law of court-fashioned election plans under exigent circumstances:

In those [emergency] situations courts are bound to apply equitable considerations and in awarding or withholding immediate relief, a court can and should consider the proximity of a forthcoming election and the mechanics and complexities of the State's election laws. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable demands on a State in adjusting to the requirements of the court's decree. Also in an emergency, a district court may adopt as an interim measure a redistricting plan that otherwise may not comply with the stringent requirements for a

permanent court ordered plan. Finally, in emergencies, courts have permitted elections to proceed on the basis of enacted plans or existing districts even when the plans in question were themselves unconstitutional.

*Id.* at 537–38 (citations omitted). We note that the facts of *Terrazas*, in which the court adopted an unprecleared plan as modified, differ from the situation in the case at bar. In *Terrazas*, for example, the court had the opportunity to receive extensive proof on which it could base its choice of an interim plan. It was in a better position to adopt the legislative plan with modifications because, in its § 5 review, the Justice Department had objected to only a few specific districts rather than generally, as here, to the entire plan.

If the 1982 plan can be used, its use will help alleviate voter confusion, help to ensure adequate time to prepare for the elections, and otherwise enhance those elections. For example, if under a plan other than the 1982 plan, a voter does not know where the polling place is for the elections, it is quite conceivable that the voter will arrive to vote at the wrong polling place at or about the time the polls are closing, only to find that under the new, short-lived plan, he or she is to vote at another place, with the result that time does not permit doing so. Elections are for the voters; it is their opportunity to elect their representatives in the Mississippi Legislature. This court finds that its concerns about the otherwise unacceptable population deviations in certain districts under the 1982 plan are far outweighed by the benefits to the voters in these elections.

Furthermore, a review of the population deviations in districts reflects that while the total population deviations are unacceptable, the deviations in most districts are acceptable, especially for this interim election.[14] In the House, for example, roughly two-thirds of the districts have a less than 10% deviation. Sixteen districts of the roughly one-third with greater than 10% deviation are majority black voting age population districts. Slightly under three-fourths of the Senate districts have a less than 10% deviation.

Although the deviation levels using existing districts would certainly be unconstitutional if this court were adopting a permanent reapportionment plan, we hold that elections may be constitutionally held using current districts *on an interim basis*. We stress that all of the options facing this court are undesirable. We conclude, however, that the priority of holding elections on a timely basis warrants a temporary departure from the one-person, one-vote principle, pending adoption of a permanent reapportionment plan by either the Legislature or this court.

This case presents the type of "significant state policies or other acceptable considerations" that the Court alluded to in *Chapman v. Meier*, 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975), suggesting that they would justify an election under an otherwise unconstitutional apportionment scheme. *Chapman* suggested that a possible justification for diverging from the one-person, one-vote requirement is "the maintenance of compactness and contiguity in legislative districts." *Id.* at 23, 95 S.Ct. at 764. We emphasize that the situation we are faced with involves several "unique features," *id.* at 26, 95 S.Ct. at 765, including an exceptionally expedited schedule and a shortage, if not lack, of acceptable options. Moreover, conducting elections using existing malapportioned districts will further a number of legitimate state poli-

---

**14.** Of the 122 House districts, 79 have a deviation less than 10%. In 16 of the 43 districts with a greater than 10% deviation, the black voting age population is greater than or equal to 50%. The black voting age population is greater than 50% in 27 of the House districts; of those 27, it is greater than 55% in 23 and greater than 60% in 19.

Under the 1982 plan, 38 Senate districts have a deviation of less than 10%. Six of the 14 districts with greater than a 9% deviation have a black voting population greater than or equal to 50%; for those with over a 10% deviation, the black voting age population is greater than or equal to 50% in three. Of the 52 Senate districts, the black voting age population is more than 50% in nine. Of those nine, it is greater than 55% in eight, and greater than 60% in four.

cies. It will allow on-time elections; avoid non-compact districts that divide up communities of interest for a political result; and permit the Legislature or this court to resolve the problem of districting in Mississippi with a full opportunity for hearings and input from the public.

### 2.

█ The plaintiffs charge that the 1982 plan dilutes black voting strength in violation of § 2. They urge that they satisfy the well established four-part test for injunctive relief.[15] However, we need not reach the issue of the 1982 plan's invalidity under § 2, because we are utilizing the 1982 plan only for interim relief, pending adoption of a plan that meets the requirements of the Constitution and the Voting Rights Act. We hold that, because this court is not adopting, or utilizing, the 1982 plan as a permanent plan, but for an interim period, plaintiffs do not satisfy the test for preliminary relief.[16]

The plaintiffs contend that this court is under a duty, even in fashioning interim relief, to create the maximum number of minority districts possible. While maximizing the number of majority black districts that can be drawn with a reasonable degree of compactness and contiguousness may well be a legitimate political, or other, objective, it is not an objective that this court can resolve in the limited time remaining. A trial necessary for resolving the detailed and varying claims for such districts would preclude the elections being timely held.

We express no opinion on the question of whether § 2 of the Voting Rights Act requires that a court, in ordering a reapportionment plan, create as many districts with a non-white majority as possibly can

be created. We note, however, that it is not at all clear that the Voting Rights Act requires a district court, in shaping a *permanent* reapportionment plan, to order the creation of districts that lack significant compactness in order to create as many non-white majority voting districts as possible. It is even less clear that, for a *temporary* plan, the Constitution or Voting Rights Act requires that a court maximize the number of non-white majority districts at the expense of creating districts with distorted boundaries.

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), for example, the Court stresses geographical compactness as a prerequisite to minority voters' establishing a claim of vote dilution. In speaking of a claim of vote dilution based on the use of multi-member districts, the Court states that "the minority group must be able to demonstrate that it is sufficiently large and *geographically compact* to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766 (emphasis added and footnote omitted). The Court also states in *dicta* that in a gerrymander case, like the one at bar, in which minority voters allege that the minority group has been split among two or more single-member districts, plaintiffs must allege that "the minority group ... is sufficiently large and compact to constitute a single-member district...." *Id.* at 50 n. 16, 106 S.Ct. at 2766 n. 16. *Gingles* does not interpret § 2 of the Voting Rights Act to require the creation of majority non-white districts that are not geographically compact. We reiterate that numerous majority black districts contained in each of the plans submitted to this court are cre-

---

**15.** There are "four requirements for preliminary injunctive relief: (1) a substantial likelihood that the movants will ultimately prevail on the merits; (2) that they will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movants outweighs the potential harm to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561–62 (11th Cir.1989), *aff'd*, —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

**16.** In *Chisom*, the Fifth Circuit held that, even where a violation of § 2 of the Voting Rights Act was established, that statutory infringement does not automatically do irreparable injury. 853 F.2d at 1188–89. Where, as here, the possibility of corrective relief at a later date exists, even an established voting rights act violation does not in and of itself merit a preliminary injunction. *Id.*

ated at the expense of distorting district boundaries.

Cases decided prior to the 1982 amendment of the Voting Rights Act uniformly hold that states are not required to seek out ways to maximize the number of black majority districts. *See, e.g., Mississippi v. United States*, 490 F.Supp. 569, 582 (D.D.C.1979) (three judge court) *aff'd mem.*, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980) ("No state or political subdivision is required to search for ways to maximize the number of black voting age population districts. Likewise, no racial group has a constitutional or statutory right to an apportionment structure designed to maximize its political strength." (citations omitted)). Similarly, in a 1981 case, the Fifth Circuit held that a "safe" minority seat in a redistricting scheme is not a federal prerequisite under either the Constitution or the Voting Rights Act. *See Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1161 (5th Cir.1981).

It is doubtful whether *Gingles* held, as plaintiffs suggest, that the amended Voting Rights Act § 2 requires that states go beyond the requirement of non-discrimination in order to create as many non-white majority districts as possible. *See, e.g., Jeffers v. Clinton*, 730 F.Supp. 196, 217 (E.D.Ark.1989) (three judge court), *aff'd mem.*, —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) ("We are not holding that the law requires the creation of any particular number of majority-black districts.").

■ Plaintiffs contend that their negotiation for 40 black districts during the legislative session reflects the degree of black representation that is appropriate under the Constitution and Voting Rights Act. While the creation of 40 black majority districts may be an acceptable legislative goal, even if it means creating a significant number of non-compact districts, it is not a goal that this court must, or necessarily should, implement as interim relief. We note that, because 35% of Mississippi's citizens are black, 40 seats out of a 122–member House (33%) approximates proportional representation for black citizens in Mississippi. The Voting Rights Act does not mandate proportional representation in a permanent reapportionment plan and certainly not for an interim plan. In fact, it is just the opposite; § 2 provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).[17]

Moreover, cases that order a remedy to a Voting Rights Act violation after a full hearing and an opportunity for plenary proof by the parties do not involve the same circumstances as we face. This case should be considered in the line of cases establishing an interim reapportionment plan for use in an imminent upcoming election. Consequently, the issue of what configuration of black majority districts best satisfies § 2 of the Voting Rights Act for a permanent plan is not in issue.

We note that, in an interim election held under the 1982 plan, black voters have a good opportunity to increase the number of black legislators in both chambers of the Mississippi Legislature (presently 20 black

---

**17.** The Fifth Circuit in *Jones v. City of Lubbock*, 727 F.2d 364, 386 (5th Cir.1984) admonishes courts to avoid proportional representation, on the one hand, and blindness to racial effect on the other:

A district judge adopting districting plans to replace an invalidated at-large system must adhere to a middle road. While a court must avoid drafting a plan as a device for installing proportional representation, so also, the court cannot blind itself to the effect of its districting plan on racial groups. [citing *Wyche*]. We believe that, at least insofar as the City complains of racial fairness, the court remained well within its discretion.

(Citation omitted.) In *Jordan v. Winter*, 604 F.Supp. 807, 814 (N.D.Miss.1984), *aff'd mem., Miss. Republican Executive Comm. v. Brooks*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984), the court stated that "[a]lthough the use of a race-conscious remedy for discrimination, approved by the Supreme Court in *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), can come into tension with Congress' disclaimer in amended § 2 of any right to proportional representation, the plan we have adopted fully rectifies the dilution of black voting strength in the Second District and satisfies the requirements of amended § 2 without achieving proportional representation for blacks in Mississippi."

members in the House, two in the Senate). For example, there is a black voting age population majority in 27 of the 122 House districts. In 19 of those 27 districts, there is a supermajority black voting age population of greater than 60%. In the Senate, there are 9 majority black voting age population districts, and 8 of those 9 contain a 55% or greater majority black voting age population. Moreover, using the 1982 plan districts and comparing the population distribution among those districts under the 1980 and 1990 census figures, it appears that there is no retrogression of minority voting strength.[18]

### 3.

Accordingly, although the legislative districts under the 1982 plan are doubtless unconstitutionally malapportioned for a full four-year term of office, this court, exercising its equitable powers, holds that under the facts in this case, including the imminent elections, they may be constitutionally utilized for interim relief. Those persons elected pursuant to 1991 legislative elections shall hold office until their successors are elected under an apportionment plan which complies with the Voting Rights Act and the United States and Mississippi Constitutions. That plan will be effected either by (a) a legislative plan, precleared by the United States Attorney General or approved by a three-judge court in the District of Columbia, 42 U.S.C. § 1973c, or (b) a plan ordered by this court.

We emphasize that, in declining to order a court-fashioned plan for use in the upcoming elections, this court is not abdicating its responsibility to enforce the provisions of the Voting Rights Act and the constitutional requirement of one-person, one-vote. Far from it. We have retained jurisdiction of this action. We would not consider—nor would the parties suggest— use of the 1982 plan if we were implementing a permanent plan. However, this court has been presented with a range of unten-

able options; and we conclude that conducting elections under the existing plan is the lesser of the available evils.

The Mississippi Legislature elected in the fall of 1991 convenes in January 1992. As ordered on August 2, 1991, we will hold a status conference on March 2, 1992, following submission of special master nominees.

### III.

For the foregoing reasons, we entered our orders on August 2 and 8, 1991, fashioning interim relief for the 1991 elections for the Mississippi Legislature and declining to enjoin those elections pending appeal of that August 2 order.

SO ORDERED.

---

**18.** An analysis of Senate districts with a 45% or greater black voting age population under the 1980 census with 1982 districts, as compared to the black voting age population of the same districts using 1990 census data, reveals that virtually all districts maintained or increased

the level of black voting age population, despite population shifts within and among districts. The parties did not introduce figures for population distribution in the House using 1980 census data.