## UPHAM ET AL. *v.* SEAMON ET AL.

No. 81–1724.  Decided April 1, 1982

PER CURIAM.

After the 1980 census, Texas' congressional delegation increased from 24 to 27 members. A reapportionment plan, Senate Bill No. 1 (SB1), was enacted on August 14, 1981, and then submitted to the Attorney General for preclearance. While it was pending before him, suit was filed in the Federal District Court for the Eastern District of Texas challenging the constitutionality of SB1 and its validity under § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973. A three-judge court was empaneled, held a hearing, and delayed any further action until after the Attorney General acted. On January 29, 1982, the Attorney General entered an objection to SB1. Specifically, he objected to the lines drawn for two contiguous districts in south Texas, Districts 15 and 27.[1] He stated that the State "has satisfied its burden of demonstrating that the submitted plan is nondiscriminatory in purpose and effect" with respect to the other 25 districts. In the face of this objection, which made SB1 unenforceable, and the obvious unconstitutionality of the prior apportionment plan,[2] the court ordered the parties to provide written submissions along with maps, plats, and other data to aid the court in reaching a court-ordered reapportionment plan. A hearing was held on February 9. The court then proceeded to resolve the Attorney General's objection to Districts 15 and 27. 536 F. Supp. 931. All other districts of the court's plan, except for those in Dallas County, were identical to those of SB1. The court devised its own districts for Dallas County, and it is that part of the District Court's judgment that is on appeal here. A stay and expedited consideration are requested.

---

[1] His objection, however, went to the entire plan, and on February 23, he refused the State's request that the objection be severed and addressed to only a portion of SB1 (but see n. 7, *infra*).

[2] The existing apportionment plan created only 24, not 27 districts, and the changes in population over the past 10 years had created extreme numerical variations between the districts, which were unconstitutional under the one-man, one-vote rule.

Judge Sam Johnson and Judge Justice wrote separately, but agreed that SB1's plan for Dallas County could not be implemented.[3] Judge Justice alone determined that the SB1 plan for Dallas County was unconstitutional. In Judge Johnson's view, since SB1 was a nullity, the entire plan had to be a court-ordered plan which must conform to §5, 42 U. S. C. §1973c, standards, including the "no retrogression rule" of *Beer* v. *United States*, 425 U. S. 130 (1976). However, he thought that in two respects the standards applicable to court-ordered plans were stricter than those that must be observed by a legislature: population equality and racial fairness. Judicial application of the no retrogression standard, in his view, is limited to consideration of purely numerical factors; unlike a legislature, a court cannot consider the "innumerable political factors that may affect a minority group's access to the political process." 536 F. Supp., at 948. Although a court must defer to legislative judgments on reapportionment as much as possible, it is forbidden to do so when the legislative plan would not meet the special standards of population equality and racial fairness that are applicable to court-ordered plans.

SB1's treatment of Dallas County failed to meet the test of racial fairness for a court-ordered plan. Under SB1, minority strength in District 5, in Dallas County, would have gone from 29.1 percent to 12.1 percent. Apparently, the minority votes had been shifted to District 24, which increased in minority population from 37.4 percent to 63.8 percent. Judge Johnson reasoned that this change would reduce minority effectiveness in District 5 substantially and would not guarantee a "safe" seat in District 24. This "would result in a severe retrogression in the Dallas County area." *Id.*, at 957, n. 39. He specifically recognized that SB1's plans for Dallas County had been formulated in response to the interests expressed by minority voters in creating a "safe" seat. He did not hold this legislative response to be unconstitutional, nor did he

---

[3] Judge Parker dissented from the relevant part of the court order—he would have followed SB1 in Dallas County.

criticize it as inconsistent with § 5 as it applied to legislative redistricting. A court, however, could not, in his view, consider the same factors as a legislature.[4] The court, therefore, redrew the boundaries of Districts 5 and 24, and the two adjoining Districts, 3 and 26. Under the court-ordered plan, District 5 would have a minority population of 31.87 percent and District 24 would have 45.7 percent.

Appellants, who are Republican Party officials in Texas, contend that the District Court simply substituted its own reapportionment preferences for those of the state legislature and that this is inconsistent with *Wise* v. *Lipscomb*, 437 U. S. 535 (1978); *McDaniel* v. *Sanchez*, 452 U. S. 130 (1981); and *White* v. *Weiser*, 412 U. S. 783 (1973).[5] They argue that in the absence of any objection to the Dallas County districts by the Attorney General, and in the absence of any finding of a constitutional or statutory violation with respect to those districts, a court must defer to the legislative judgments the

---

[4] The relevant passage of Judge Johnson's opinion reads as follows:

"This Court recognizes that certain minority group members expressed a desire for a 'safe' minority district in Dallas County. After consideration of numerous political factors, and substantial legislative battling, the Texas Legislature decided on the configurations in S.B.1 . . . . The legislature was at liberty to engage in such considerations. This Court, in fashioning a nonretrogressive apportionment plan does not have that privilege. It must evaluate the new plan without access to questions regarding the ability of separate minority groups to form coalitions or other political concerns. . . . It is not before this Court to determine whether considerations valid in the legislative context justify simply increasing swing-vote influence in one district at the expense of the influence previously enjoyed in a neighboring district. This Court determines, however, that, in the context of a court-ordered apportionment plan, such a trade-off would result in a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." 536 F. Supp., at 957, n. 9.

[5] Appellants are supported in this appeal by the State of Texas. While Texas agrees with them on the merits of this case and supports a summary reversal of the District Court decision, it asks that this Court delay any remedial action until after the 1982 elections. In other words, Texas chal-

plans reflect, even under circumstances in which a court order is required to effect an interim legislative apportionment plan.[6] We agree and, therefore, summarily reverse.

The relevant principles that govern federal district courts in reapportionment cases are well established:

> "From the beginning, we have recognized that 'reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.' We have adhered to the view that state legislatures have 'primary jurisdiction' over legislative reapportionment. . . . Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task

---

lenges the merits of the District Court decision, but contends that it would be too disruptive and expensive to attempt to alter the 1982 elections at this point.

[6] Appellants propose two other arguments. First, under Texas law an invalid statutory provision is severable. Therefore, the fact that the Attorney General objected to the validity of SB1's district lines for 2 districts did not invalidate the plans for the other 25 districts. Second, the "stricter standards" applicable to court-ordered plans apply only to the use of multimember districts and population variations beyond a de minimis amount. In particular, this "stricter standard" does not apply to plans that have already been precleared by the Attorney General. In light of our disposition of the case, we need not reach either of these arguments.

nor 'intrude upon state policy any more than necessary.'" *White* v. *Weiser,* 412 U. S., at 794–795 (citations omitted).

*Weiser* itself presents a good example of when such an intrusion is not necessary. We held there that the District Court erred when, in choosing between two possible court-ordered plans, it failed to choose that plan which most closely approximated the state-proposed plan. The only limits on judicial deference to state apportionment policy, we held, were the substantive constitutional and statutory standards to which such state plans are subject. *Id.,* at 797.

We reached a similar conclusion in *Whitcomb* v. *Chavis,* 403 U. S. 124, 160–161 (1971), in which we held that the District Court erred in fashioning a court-ordered plan that rejected state policy choices more than was necessary to meet the specific constitutional violations involved. Indeed, our decision in *Whitcomb* directly conflicts with the lower court's order in this case. Specifically, we indicated that the District Court should not have rejected all multimember districts in the State, absent a finding that those multimember districts were unconstitutional. *Ibid.* We reached this conclusion despite the fact that we had previously held that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multimember districts as a general matter." *Connor* v. *Johnson,* 402 U. S. 690, 692 (1971). See also *Chapman* v. *Meier,* 420 U. S. 1, 19 (1975) (indicating that court-ordered plans should, in some circumstances, defer to, or respect, a state policy of multimember districting).

It is true that this Court has held that court-ordered reapportionment plans are subject in some respects to stricter standards than are plans developed by a state legislature. *Wise* v. *Lipscomb, supra,* at 540; *Connor* v. *Finch,* 431 U. S. 407, 414 (1977). This stricter standard applies, however, only to remedies required by the nature and scope of the violation: "The remedial powers of an equity court must be adequate to the task, but they are not unlimited."

*Whitcomb* v. *Chavis, supra,* at 161. We have never said that the entry of an objection by the Attorney General to any part of a state plan grants a district court the authority to disregard aspects of the legislative plan not objected to by the Attorney General.[7] There may be reasons for rejecting other parts of the State's proposal, but those reasons must be something other than the limits on the court's remedial actions. Those limits do not come into play until and unless a remedy is required; whether a remedy is required must be determined on the basis of the substantive legal standards applicable to the State's submission.

Whenever a district court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of "reconciling the requirements of the Constitution with the goals of state political policy." *Connor* v. *Finch, supra,* at 414. An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect. Thus, in the absence of a finding that the Dallas County reapportionment plan offended either the Constitution or the Voting Rights Act, the District Court was not free, and certainly was not required, to disregard the political program of the Texas State Legislature.

---

[7] The Attorney General took the same position in declining to grant preclearance to that portion of SB1 that he did not find objectionable:

"Since the federal district courts will be acting in the stead of the Legislature we believe that the courts should attempt to effectuate the legislative judgment to the extent possible and modify the Legislature's plans only as necessary to meet the concerns raised in the objection letters. In other words, we believe the court should make such modifications to the plans as would normally be made by the Legislature if it were in session." App. to Juris. Statement F-3 (letter of Wm. Bradford Reynolds, Assistant Attorney General, to Texas Secretary of State).

In this Court, the Solicitor General takes a slightly different position. He contends that the question of what weight a district court should give to a legislative plan that is partially objected to by the Attorney General is substantial and, therefore, merits plenary consideration by this Court.

44

Although the District Court erred, it does not necessarily follow that its plan should not serve as an interim plan governing the forthcoming congressional elections. The filing date for candidates, which was initially postponed by the District Court, has now come and gone. The District Court has also adjusted other dates so that the primary elections scheduled for May 1 may be held. The State of Texas, although it disagrees with the judgment of the District Court with respect to Dallas County, urges that the election process should not now be interrupted and a new schedule adopted, even for Dallas County. It is urged that because the District Court's plan is only an interim plan and is subject to replacement by the legislature in 1983, the injury to appellants, if any, will not be irreparable.

It is true that we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. See, *e. g.*, *Bullock* v. *Weiser*, 404 U. S. 1065 (1972); *Whitcomb* v. *Chavis*, 396 U. S. 1055 (1970). Necessity has been the motivating factor in these situations.

Because we are not now as familiar as the District Court with the Texas election laws and the legal and practical factors that may bear on whether the primary elections should, be rescheduled, we vacate the District Court judgment and remand the case to that court for further proceedings. See *Connor* v. *Waller*, 421 U. S. 656 (1975); *Wesberry* v. *Sanders*, 376 U. S. 1, 4 (1964). Having indicated the legal error of the District Court, we leave it to that court in the first instance to determine whether to modify its judgment and reschedule the primary elections for Dallas County or, in spite of its erroneous refusal to adopt the SB1 districts for Dallas County, to allow the election to go forward in accordance with the present schedule.

The judgment of the Court shall issue forthwith.

*So ordered.*