Jesse **CAMPOS, W.R. (Resendez) Morris, and Mexican American Bar Association of Houston, Plaintiffs,**

v.

**CITY OF HOUSTON, et al., Defendants.**

**Civ. A. No. H–91–885.**

United States District Court,
S.D. Texas,
Houston Division.

Oct. 12, 1991.

---

Frumencio Reyes, Jr., Reyes & Reyes–Castillo P.C., Houston, Tex., for plaintiffs.

---

Myra A. McDaniel, Bickerstaff, Heath & Smiley, Austin, Tex., for defendants.

John D. Lenoir, Asst. U.S. Atty., Houston, Tex., for John R. Dunne, Asst. Atty. Gen., Civ. Rights Div., Dept. of Justice.

Wayne Fox, Michael J. Zomcik, Bonham, Carrington & Fox, P.C., Houston, Tex., for Clymer Wright and Citizens for Term Limitation.

Barry Barnes, Barnes & Turner, Houston, Tex., for Mayoral Candidate Sylvester Turner.

## ORDER

HITTNER, District Judge.

Pending before this Court is a supplemental counterclaim (attached to Document # 24) and first amended supplemental counterclaim (filed October 10, 1991) filed by the defendant City of Houston ("the City"). The parties appeared before the Court on October 9, 1991, at 10:00 a.m. for a scheduled hearing on the counterclaim. Additionally, the Court granted leave for two nonparties to participate in the hearing: Clymer Wright, who filed a motion to intervene on behalf of himself and other voters supporting Citizens for Term Limitation, and the United States Department of Justice. The parties subsequently appeared before the Court on October 11, 1991, at 1:30 p.m. for a continuation of the aforementioned hearing. At that time, the Court additionally granted leave for nonparty and mayoral candidate Sylvester Turner to participate in the hearing. The Court has considered the counterclaim, the submissions of the parties, the argument of counsel, the testimony in open court, and the applicable law.

### Statement of Facts

In 1979 the City of Houston adopted the current system of nine councilmembers elected from single-member districts, five councilmembers elected at-large, and the mayor elected at-large ("9–5–1 plan # 1"). After the 1990 federal census data was published, the City Council of the City of Houston formally determined through Ordinance 91–282 enacted on February 27, 1991, that the population of the existing council districts was "materially imbalanced." See Defendant's Exhibit 5. In April 1991, the plaintiffs, Mexican–American and Hispanic residents of Houston and the Mexican American Bar Association of Houston, originally filed this cause of action challenging the "at-large" portion of the City's scheme for electing members of the City Council. Plaintiffs brought the instant lawsuit pursuant to 42 U.S.C. §§ 1971, 1973, 1983, 1988 and the Fourteenth and Fifteenth Amendments to the United States Constitution. Plaintiffs sought a permanent injunction prohibiting the City from holding any future elections for City Council under the 9–5–1 plan # 1. See Document # 3.

On June 5, 1991, the City Council adopted Ordinance 91–794, re-drawing the nine single-member districts to be of approximately equal population size. The Council alternatively proposed to change the City Council's structure to a council of 16 members elected from single-member districts, 6 members elected at-large, and a mayor elected at-large ("the 16–6–1 plan"). The City submitted both the new, proposed 9–5–1 plan ("9–5–1 plan # 2") and the 16–6–1 plan to the United States Attorney General for preclearance pursuant to the Voting Rights Act § 5. 42 U.S.C. § 1973c (1965). The Attorney General's review of the 16–6–1 plan, however, was contingent upon voter approval of this plan pursuant to Texas state law. On August 10, 1991, the voters of the City of Houston rejected the 16–6–1 plan. Thus, the Attorney General reviewed only 9–5–1 plan # 2. On August 21, 1991, the Attorney General made a written request for additional information regarding 9–5–1 plan # 2. The City began responding to the request on August 29, 1991, and the submission was complete by September 27, 1991.

Late in the afternoon on Friday, October 4, 1991, Assistant Attorney General John R. Dunne transmitted a letter to the City denying preclearance and interposing an objection to 9–5–1 plan # 2 under the Voting Rights Act § 5. Dunne concluded that the City had failed to sustain its burden under § 5 that the "submitted change has

neither a discriminatory purpose nor a discriminatory effect." See Defendants' Exhibit # 8. The City's recourse under § 5 was threefold: (1) ask the Attorney General to reconsider the objection, (2) seek a declaratory judgment from a three-judge panel of the United States District Court for the District of Columbia, or (3) abandon the plan. 42 U.S.C. § 1973c (1965). The City informed the Court that it has abandoned 9–5–1 plan # 2 as a *permanent* redistricting plan.

Currently, no viable plan exists to govern the November 5, 1991 elections for the Houston City Council. The City determined last February, and conceded in open court, that the districts under 9–5–1 plan # 1 are malapportioned. The City cannot itself implement 9–5–1 plan # 2 because of the Attorney General's objections. Two other plans proposed are not currently available for interim use in the November 5 election. To enable the November 5 election to proceed as scheduled, the City filed the instant supplemental counterclaim requesting this Court to designate the districts drawn in 9–5–1 plan # 2 as an interim plan for this election only. Additionally, at the October 11, 1991 hearing, both parties asked this Court to determine whether a referendum regarding a 16 single-member district plan ("the 16–1 plan") should be included on the November 5, 1991 ballot in the event that the Court enters an interim plan.

### Power of the Court to Enter an Interim Plan

Reapportionment is primarily a legislative responsibility. Federal judicial relief becomes appropriate, however, when the legislative body "fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Upham v. Seamon*, 456 U.S. 37, 41, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982) (quoting *White v. Weiser*, 412 U.S. 783, 794–795, 93 S.Ct. 2348, 2354–2355, 37 L.Ed.2d 335 (1973)). In Houston, the City Council bears the first responsibility for redistricting under the existing 9–5–1 council structure mandated by the city charter. The Council's efforts to redraw the single-member districts, reflected in Ordinance 91–794, failed under § 5 scrutiny. The legislative body, the City Council, has therefore failed to reapportion in accordance with the Voting Rights Act § 5 and the United States Constitution. Under such circumstances, this Court functions as a court of equity charged with fashioning interim relief. *Watkins v. Mabus*, 771 F.Supp. 789, 798 (S.D.Miss.1991) (Barksdale, Circuit Judge, and Lee and Pickering, District Judges), *stay pending appeal denied*, (U.S.Sup.Ct. Aug. 20, 1991) (holding that "[t]he application for injunction and stay pending appeal presented to Justice Scalia and by him referred to the Court is denied," although Justices Marshall and Blackmun noted that they would grant the application). *See also Terrazas v. Clements*, 537 F.Supp. 514 (N.D.Tex. 1982) (3–judge court) (Court ordered the 1982 election for the Texas legislature to proceed according to modified unprecleared plan).[1] The three-judge panel in *Watkins* recently faced a dilemma much like that which this Court faces now. The State was without a constitutional plan for the 1991 election of the Mississippi Legislature. *Id.* at 806. The Mississippi general elections scheduled for November 5, 1991 were imminent and did not permit an opportunity for preclearance of a constitutional plan. *Id.* at 802, 806. In their *per curiam* opinion, the panel determined that it was essential for the Court to exercise its equitable powers to implement an interim plan. *Id.* at 806. This Court, too, determines that in the absence of a constitutional plan and in the face of imminent elections, equity demands an interim plan.

### The Options Before the Court

In fashioning interim relief, this Court should consider the proximity of the impending election and the mechanics of the election laws, and should rely upon general

---

1. A three-judge panel is required "when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a) (1960). Because the instant case involves a citywide election, a three-judge panel need not be convened.

equitable principles. *Reynolds v. Sims,* 377 U.S. 533, 585–587, 84 S.Ct. 1362, 1393–1395, 12 L.Ed.2d 506 (1964); *Terrazas,* 537 F.Supp. at 538. If time does not permit a court to itself create a plan that meets the standards of the Voting Rights Act § 2, that court should consider the options already available. *Watkins* at 800. The Supreme Court has at times authorized district courts to permit elections to proceed under interim districting plans "that do not in all respects measure up to the legal requirements, even constitutional requirements." *Upham,* 456 U.S. at 44, 102 S.Ct. at 1522; *Watkins* at 802; *Terrazas,* 537 F.Supp. at 538.

Time does not permit this Court to either design its own plan or receive extensive proof on the issue of the best interim plan. The election is imminent, absentee balloting is scheduled to begin in four days, and the county and city's election machinery is in progress. As in *Watkins,* this Court is faced with "an exceptionally expedited schedule and a shortage, if not lack, of acceptable options." *Id.* at 804. The Court's options for an interim plan, none of which is ideal, include: 9–5–1 plan # 1, other recently-proposed plans, and 9–5–1 plan # 2.

*First Option: 9–5–1 Plan # 1*

As a general rule, 9–5–1 plan # 1 would remain in effect until a new plan is precleared by the Attorney General. *City of Rome v. United States,* 446 U.S. 156, 182, 100 S.Ct. 1548, 1564, 64 L.Ed.2d 119 (1980). The plaintiffs asked this Court to enjoin the use of 9–5–1 plan # 1 when they filed this lawsuit. The City conceded in open court that 9–5–1 plan # 1's single-member districts now violate the one-person, one-vote principle. The Court thus determines, based upon the City's representations, that injunctive relief is appropriate concerning 9–5–1 plan # 1.

*Second Option: Other Proposed Plans*

Two other plans were proposed to the Court for use as an interim plan. First, the plaintiffs suggested a plan with 16 single-member districts. The 16–1 option is a variation of the 16–6–1 plan that the voters refused to approve in the citywide refer-endum. Second, last-minute City Council sessions resulted in yet another 9–5–1 plan ("9–5–1 plan # 3") passed yesterday, October 11, 1991. According to testimony, 9–5–1 plan # 3 would have the effect of pairing two incumbents and potentially jeopardizing a current African–American district. The plaintiffs informed the Court that they oppose 9–5–1 plan # 3, as well as any plan other than 16–1. The plaintiffs indicated in open court an intent to formally present their opposition to 9–5–1 plan # 3 to the Department of Justice, but they have not yet had the opportunity.

The City forwarded 9–5–1 plan # 3 to the Attorney General for expedited § 5 preclearance prior to the hearing on October 11, 1991, with no advance notice to this Court. This morning, less than two hours before this order was scheduled to issue, the Department of Justice notified the Court by facsimile transmission that 9–5–1 plan # 3 had received tentative approval. Specifically, the Assistant Attorney General's letter reads, in part, as follows:

> The Attorney General does not interpose any objection to the specified change [9–5–1 plan # 3]. However, we note that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period.

The sixty-day statutory review period does not expire until approximately December 10, 1991, a date which is later than both the scheduled general election and the anticipated run-off election.

This Court does not dispute that either 16–1 or 9–5–1 plan # 3 may be a viable plan. Yet, given the circumstances, the Court cannot adequately review those plans unless the Court reopens filing deadlines and/or postpones absentee (mail) and early balloting.

*Third Option: 9–5–1 Plan # 2*

Candidate filing for the positions of mayor, comptroller, and members of the coun-

cil, which closed on September 23, 1991, was conducted under the unprecleared 9–5–1 plan # 2. Early absentee ballots were scheduled to have been mailed on October 7, 1991, but were held after the Attorney General denied preclearance. Early (absentee) balloting is scheduled to begin October 16, 1991.

Only 9–5–1 plan # 2 will enable the elections to proceed as scheduled. The 9–5–1 plan # 2 *is not a retrogression;* that is, it does not place Hispanic voters in a worse position than 9–5–1 plan # 1. Ideally, the Court could modify the plan, on an interim basis, in an attempt to address the Attorney General's objection, but the general nature of the objection and time constraints realistically preclude this modification.

### The Interim Plan

Despite the Attorney General's preclearance of 9–5–1 plan # 3 less than two hours ago, this Court implements the 9–5–1 plan # 2 on an interim basis to insure that the 1991 election will proceed on schedule. Testimony of the County Clerk of Harris County established that, were 9–5–1 plan # 3 to be used, a separate, delayed city election would be inevitable, and lower voter turnout would result. The goals to maximize voter turnout and to minimize voter confusion and taxpayer cost would be thwarted by the delay occasioned in implementing the 9–5–1 plan # 3 at this time. Further testimony revealed that at this point, *any* change in the electoral scheme would necessitate a separate city election at considerable expense to the City.[2]

This Court, in considering the best interests of the voters of the City, finds that the election should proceed as scheduled. Holding the election on a timely basis will result in the highest possible voter turnout, the least voter confusion, and a savings to the City of approximately $350,000. Therefore, the Court finds that 9–5–1 plan # 2 is the best option available at this time.

The Court stresses that it is implementing 9–5–1 plan # 2 as interim relief only. The question of what council structure would best satisfy § 2 of the Voting Rights Act for a permanent plan is not at issue. *Watkins* at 806.

### Conclusion

While the Court recognizes the last minute efforts of all parties to reach a compromise, those unsuccessful efforts have now required this Court to address the foregoing options with regard to the November 5, 1991 elections. As in *Watkins,* this Court exercises its equitable power to insure a timely election, as the voters of the City of Houston should not be placed at a disadvantage by legal or political maneuvering. All voting for the November 5, 1991 elections must proceed timely and can do so *only* under an interim use of 9–5–1 plan # 2.

Based on the foregoing, with respect to an interim plan, the Court

ORDERS that:

(1) Plaintiffs' request for preliminary injunction is GRANTED to the following extent: the City of Houston is ENJOINED from using 9–5–1 plan # 1 (the existing 9–5–1 plan) to conduct the November 5, 1991 City elections;

(2) 9–5–1 plan # 2 is to be utilized as an interim plan to enable the November 5, 1991 elections to proceed. Those persons elected in the November 5, 1991 City Council election shall hold office until their successors are elected under a permanent apportionment plan (9–5–1 plan # 3 or otherwise) which complies with the Voting Rights Act and the United States Constitution.

Additionally, based upon the plaintiffs' objection to the 16–1 referendum, it is further ORDERED that the 16–1 referendum shall not appear on the November 5, 1991 ballot.

All other interim relief not specifically granted herein is denied.

---

**2.** The City Secretary testified that the cost of a separate city election is approximately $750,000.

For the city to hold its election jointly with the state, the cost is $400,000.