**Lee Roy STRAW, et al., Plaintiffs,**

v.

**BARBOUR COUNTY and W. Mack Price, in his official capacity as Judge of Probate for Barbour County, Alabama, Defendants.**

Civ. A. No. 94–T–502–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 15, 1994.

Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Solomon S. Seay, Jr., Montgomery, AL, for plaintiffs.

James L. Martin, William V. Neville, Jr., Eufaula, AL, for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

The plaintiffs have brought this lawsuit on behalf of all black resident citizens and electors of Barbour County, Alabama.[1] The plaintiffs charged, among other things, that the current district lines for the Barbour County Commission violate the "one-person, one-vote" principle of the fourteenth amendment to the United States Constitution and the "vote dilution" principles of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.[2] The defendants are Barbour County and W. Mack Price, the Judge of Probate of Barbour County. The defendants have admitted that the county's current districting scheme is malapportioned and thus violates the fourteenth amendment. There-

---

1. The court has certified a class pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. *See* Order of August 5, 1994.

2. Section 2 provides as follows:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

fore, the only issue before the court is an appropriate remedy. For the reasons that follow, the court concludes that it should approve and adopt as an interim districting plan for the upcoming 1994 elections the plan passed by the county commission on September 13, 1994.

## I. BACKGROUND

Barbour County is located in southeast Alabama. According to 1990 census figures, the county is comprised of 25,417 people of whom 14,118, or 55.55%, are white, and 11,-194, or 44.04%, are black.[3] The county is currently governed by a board of seven commissioners, two of whom are black. Commissioners stand for election every six years in single-member districts, with all seven commissioners up for election simultaneously. In early 1994, the commission approved changes in district lines for the commission elections scheduled for 1994.

In their original complaint filed on April 28, 1994, the plaintiffs challenged these new district lines on two grounds. First, they claimed that the new districts violated § 2 of the Voting Rights Act, which forbids districting plans in which minorities have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Second, they claimed that the new districts had not been "precleared" as required by § 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c.[4] A three-judge court was convened pursuant to § 5.[5] That court enjoined the 1994 elections on the ground that the new district lines had not either been precleared by the United States Department of Justice or approved by the United States District Court of the District of Columbia, as required by § 5.[6]

Following this decision by the three-judge court, the plaintiffs amended their complaint on July 11, 1994, to challenge the existing

---

**3.** The remaining 105, or 0.41%, are neither black nor white.

**4.** Section 5 provides, in part, as follows:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on Novem-

ber 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made."

**5.** Order of May 9, 1994.

**6.** Order of May 19, 1994.

district lines on two grounds, both cognizable by a single-judge court. First, they claimed that, because the existing district lines were constructed using 1980 census data, the districts were malapportioned and thus violated the one-person, one-vote principle of the fourteenth amendment. Second, they claimed that the existing district lines diluted black voting strength and afforded blacks less opportunity than whites to participate in the political process, in violation of § 2. The defendants conceded that the existing districts violated the fourteenth amendment.[7] *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, the only issue for this single-judge court was an appropriate remedy.

On August 4, 1994, the county commission adopted a new districting plan for the 1994 elections. The parties then filed a joint motion submitting the August 4 plan as a settlement and proposed consent decree to the court. The August 4 plan provided for a primary election on September 6; a run-off election on September 27; and a general election on November 8, the same date as the general election for all state-wide Alabama offices. The court tentatively approved the proposed consent decree, subject to notice, opportunity for objections, and a fairness hearing.[8]

The court held a fairness hearing on September 2, 1994. At that hearing and in written objections filed with the court, a number of opponents of the August 4 districting plan presented their views. Opponents of the plan presented five primary objections: (1) the proposed plan unfairly treated incorporated areas, particularly the City of Eufaula; (2) the proposed plan divided communities of interest, joined conflicting interests, was not compact, and created confusion as to which commissioner represented which people; (3) the time in which to qualify and campaign for election was too short; (4)

there was no public notice or opportunity for comment before the county commission agreed to the proposed plan; and (5) the proposed plan was constitutionally invalid because it improperly used racial considerations. Some of the objectors formed a coalition and hired legal counsel to present their views. The coalition presented the court with an alternative plan for consideration. The court was also informed at the fairness hearing that, under the commission's August 4 plan, the opening qualifying date for candidates was August 5 and the closing date was August 18.

After hearing testimony and considering the objections, the court enjoined the primary election scheduled for September 6.[9] The court took this action because the August 4 plan did not provide enough time before the primary election to educate voters and potential candidates about new election districts and to allow candidates to campaign for office. The court also found that the county commission had intentionally split the Town of Clayton between two districts for unnecessary and unjustified racially discriminatory reasons, in violation of the fourteenth amendment. The uncontradicted testimony was that the predominantly white section of Clayton was placed in district 5 and the predominantly black section of Clayton was placed in district 1 in order to satisfy the desire of the commissioner representing Clayton to have the white section of that city in the majority-white district 5 instead of the majority-black district 1. The court therefore orally directed the defendants to modify the August 4 districting plan, first, to place the entire Town of Clayton in only one district and, second, to establish new and more reasonable qualifying deadlines and election dates.

The plaintiffs, the defendants, and the coalition of objectors were unable to reach an agreement on a new plan. Nevertheless, on September 12, the plaintiffs unilaterally sub-

---

7. Answer filed on July 19, 1994.

8. Order of August 5, 1994.

9. Order of August 6, 1994.

mitted to the court a revised plan that remedied the race-based decision to split Clayton and yet was substantially the same as the August 4 joint plan.

On September 13, the commission adopted a new redistricting plan that also remedied the Clayton split but which differed substantially from the August 4 joint plan. That plan also extended the qualifying deadline to September 30. It required that the primary election be held on October 11 and any run off election be held on October 25. The September 13 plan kept the general election on November 8.

Immediately following the county commission's adoption of a new redistricting plan on September 13, the court held another hearing. At the hearing, the plaintiffs supported the new plan adopted by the commission.[10] The coalition objected to the new plan and presented the court with a second alternative plan similar in nature to the first coalition plan presented at the fairness hearing. The coalition objected to the commission's September 13 plan for the following reasons: (1) it gives the City of Eufaula disproportionate influence; (2) it divides communities of interest and joins conflicting interests; (3) there was no public notice before the county commission met to adopt the new plan; (4) the coalition had not been given adequate opportunity to consult with the plaintiffs and the commission about the plan; (5) the plan was adopted in order to protect a black commissioner from a black challenger; (6) the plan violates § 2 of the Voting Rights Act; and (7) either of the coalition's plans was superior because they created a black influence district unlike any of the other plans. At the

end of the second hearing, so that the county commission could proceed forthwith to place into effect a new districting plan in time for the November 1994 state-wide elections, the court orally announced from the bench its decision that the defendants would be required to implement the commission's September 13 districting plan. The court said that a formal memorandum opinion and judgment would follow in a day or two. This is the promised opinion.

## II. DISCUSSION

The court now has four redistricting plans before it: (1) the plaintiffs' modified version of the August 4 plan that places Clayton in one district; (2) the September 13 plan adopted by the county commission; (3) the coalition's first alternative plan; (4) the coalition's second alternative plan.[11] The court has considered the relative merits of each of these plans and adopts the commission's September 13 plan as an interim plan for the following reasons.

### A.

■ Reapportionment or redistricting is first and foremost a legislative decision. E.g., White v. Weiser, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973). Therefore, when called upon to approve or fashion a districting plan, whether interim or permanent, a court must give "full deference" to the government-sponsored plan to the extent that plan does not violate constitutional or statutory requirements. As the

---

10. Although the plaintiffs support the September 13 plan adopted by the commission. the court does not treat that plan as a settlement because there has been no notice to the plaintiff class as is required under Rule 23(e) of the Federal Rules of Civil Procedure. When the court enjoined the September 6 primary election and directed the commission to revise the August 4 plan to reunite the Town of Clayton, the parties were forced to scramble for an acceptable plan on a tight schedule. It was therefore not possible to go through the procedures necessary to notify the plaintiff class.

Nevertheless, because the court has the independent responsibility to assess and protect the

interests of the plaintiff class, the court has still reviewed the September 13 plan with this responsibility in mind. Cf. Shuford v. Alabama State Board of Education, 846 F.Supp. 1511, 1517 (M.D.Ala.1994). The court finds that the commission's September 13 plan, for the reasons given later in this memorandum opinion, is fair, reasonable, legal, and in the best interest of the plaintiff class.

11. The August 4 plan adopted by the county commission and embodied in the proposed consent decree was rejected by the court at the fairness hearing.

Supreme Court wrote in *Upham v. Seamon,* 456 U.S. 37, 40–41, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982) (per curiam), "in the absence of any finding of a constitutional or statutory violation ..., a court must defer to the legislative judgments the plans reflect, even under circumstances in which a court order is required to effect an interim legislative apportionment plan." Or to put it another way, "The only limits on judicial deference to state apportionment policy ... [are] the substantive constitutional and statutory standards to which such state plans are subject." *Id.* at 42, 102 S.Ct. at 1521. The September 13 plan adopted by the county commission is the only plan before the court that requires this full deference. The plan unilaterally submitted by the plaintiffs and the coalition's two plans are obviously not legislative plans.

▮▮▮ Because the commission's plan is legislative, however, it must be precleared. *McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). Therefore, the court will implement the commission's September 13 plan on an interim basis only. *Upham,* 456 U.S. at 43–44, 102 S.Ct. at 1522; *Burton v. Hobbie,* 561 F.Supp. 1029, 1036 (M.D.Ala.1983) (three-judge court).

## B.

▮▮▮ The county commission's September 13 plan does not suffer from any constitutional or statutory defects. It meets the one-person, one-vote requirement. In addition, it remedies the Clayton problem by placing that town in one district. The coalition of objectors, however, contends that the districts are unconstitutional because they were drawn in such a way as to exclude a potential black challenger from a black incumbent's district. This intra-racial political squabble does not rise to the level of a constitutional violation.

The coalition also contends that the plan violates § 2. Admittedly, any proposal to remedy a one-person, one-vote violation must itself conform with § 2. *Cf. Dillard v. Crenshaw County,* 831 F.2d 246, 249 (11th Cir. 1987). All four of the plans before the court create three majority-black districts. The coalition nonetheless maintains that the commission's September 13 plan dilutes the black vote for two reasons.[12] First, the coalition argues that the plan shifts power from the increasingly black rural areas in the western part of Barbour County to the increasing white urban areas in the eastern part of the county. In particular, it gives the City of Eufaula in the eastern part of the county enough votes to control the commission. The court assumes without so deciding that this is a possible § 2 violation. Second, the coalition argues that, although the September 13 districting plan creates three majority-black districts, it fails to create, as does the coalition's second alternative plan, an "influence district" in which blacks comprise 48.57% of the population; the best influence district in the commission's plan has a black population of 37.76%. Once again, the court assumes without so deciding that this is a possible § 2 violation. However, based on the evidence presented by the coalition, the court is unable to conclude that the commission's plan violates § 2.

▮▮▮ In *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986), the Supreme Court set forth the manner in which a trial court should assess a § 2 results claim. The claim is established where the "totality of circumstances," 42 U.S.C.A. § 1973(b), reveals that "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their

---

12. The attorney for the coalition stated at the September 13 hearing that the court was "not presented with any claim that ... violates Section 2 or the fourteenth amendment." It is unclear how a plan that does not violate either § 2 or the fourteenth amendment can still be dilutive. Nevertheless, because in a class action a court has an independent duty to determine whether a proposed redistricting plan is legal and thus satisfies the requirements of § 2, this court has proceeded to determine whether the county commission's September 13 plan violates § 2.

choice." *Id.* at 44, 106 S.Ct. at 2763, quoting S.Rep. No. 97–417, 97th Cong.2d Sess. 28, *reprinted in* 1982 U.S.C.C.A.N. 177, 206. The *Gingles* Court went on to list nine Congressional factors typically considered in evaluating a results claim.[13] The Court observed that the compilation of these factors is premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representative." *Id.* at 47, 106 S.Ct. at 2764–65. The *Gingles* Court then refined the above general observations to address the specific type of governmental decision being challenged: the decision of a government to employ, in the face of a majority-vote requirement, at-large districting rather than single-member districts with one or more majority-black districts. *Id.* at 45, 106 S.Ct. at 2764. Plaintiffs must show three factors to make out a claim under *Gingles.* First, in the context of a majority vote requirement and when comparing an at-large system and a scheme with a majority-black single-member district, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766. This factor can be stated more generally as requiring that the minority be able to demonstrate that its difficulty in electing candidates of its choice is in some measure attributable to the challenged election feature, *id.* at 48,

106 S.Ct. at 2765, or, to put it another way, that the minority has the potential to elect representatives in the absence of the challenged feature. *Id.* at 50–51 & n. 17, 106 S.Ct. at 2766–67 & n. 17. The coalition's claims are not brought in the at-large context and, therefore, belong to this more general category. The second requirement is that the minority group constitutes a politically cohesive unit. *Id.* at 51, 106 S.Ct. at 2766. The third requirement is that the white majority votes sufficiently as a block so as to usually defeat the minority's preferred candidate. *Id.* at 51, 106 S.Ct. at 2766–67. The analysis of a § 2 claim becomes even more complex and difficult where the challenge is not to an at-large system or multimember system, but rather, as in the present case, "comes down to the reasonableness of drawing a series of district lines in one combination of places rather than another." *Johnson v. De Grandy,* —— U.S. ——, ——, 114 S.Ct. 2647, 2658, 129 L.Ed.2d 775 (1994). The coalition has failed completely to present the sophisticated statistical and historical evidence that would be necessary under the "totality of circumstances" to establish a § 2 violation where the issue is only drawing a series of district lines in one combination of places rather than another.

### C.

■ The court also rejects the coalition's contention that the court cannot approve the

---

**13.** These factors are: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the

state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2759–60.

September 13 plan because the county commission violated state law when it met and adopted the plan without giving prior public notice of its meeting.[14] Assuming without so finding that a state law violation does exist, that would not cause the plan passed by the commission to lose its status as a legislative plan. The Eleventh Circuit Court of Appeals has held that when a county commission reapportions itself in violation of state law, the resulting plan is still considered to be legislatively enacted. *Tallahassee Branch of NAACP v. Leon County,* 827 F.2d 1436 (11th Cir.1987), *cert. denied,* 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391. Therefore, under the special exigent circumstances presented here, the court holds that it must give deference to the plan enacted by the commission even if state law was violated.[15]

### D.

In addition, although the commission's September 13 plan deviates substantially from the previously publicized district lines and will likely result in some confusion about who is in what district, the plan allows for an election schedule that corresponds to Alabama's general election.[16] Admittedly, citizens will only have slightly over two weeks to announce their candidacies. The court has, nevertheless, had to balance the merits of lengthening the qualifying and campaigning time with the merits of keeping the election on the state schedule for general elections. The court finds that the more important factor is ensuring that voter turnout will be as high as possible. The quick pace of this election is not ideal; but the alternative is even less appealing. If the court were to postpone the election, this would likely drastically decrease turnout and potentially alter the results of the election. Furthermore, delay would allow incumbents in malapportioned seats to hold over. The court takes the parties at their word that notice of the new districts will be published in papers in Barbour County beginning on September 15. The court also expects that notice will be given by direct mail, radio, and television if these methods are feasible. Finally, by now most citizens of Barbour County must be aware of the uncertainty regarding districting. That a new plan has been ordered into effect should not come as a complete surprise.

### E.

■ The court further rejects the coalition's contention that the commission's September 13 plan does not follow traditional districting principles. For instance, the coalition contends that the plan is unfair to certain areas, divides communities of interest, and joins conflicting interests, among other problems. The court groups all of these and similar objections together as examples of considerations usually taken into

---

**14.** In addition, the coalition previously objected to the August 4 plan on the ground that the lack of notice and opportunity to be heard was contrary to federal regulations relating to § 5 of the Voting Rights Act. The court assumes that the coalition continues to press this objection in regard to the September 13 plan as well. The court does not reach this issue because there is no § 5 claim in this case at this time. The September 13 plan will still have to be precleared. If the coalition wishes to press its notice objection under § 5, the proper way to do so is to bring the objection in the appropriate § 5 forum.

**15.** The court is aware that the circumstances of this case are distinguishable from *Leon County*. In that case, the commission lacked authority to reapportion itself without approval of the voters.

827 F.2d at 1438. This restriction would likely not serve to substantively alter the opinions of the commissioners as to the best plan. Here, in contrast, lack of opportunity for comment could cause the commission to reach a different result than it otherwise would if fully informed of citizens' views. The Barbour County Commission, however, had to act at the last minute on September 13, with no opportunity for notice. Because of this time pressure, the court applies the *Leon County* holding. The court reserves the question of whether lack of notice under less extraordinary circumstances would still require the court to defer.

**16.** For the sake of argument, the court assumes that all four of the plans would allow for a timely general election. Nonetheless, the court must give deference to a valid legislative plan as discussed above.

account in redistricting but that are not constitutionally or statutorily required.[17] As the Supreme Court has recently reaffirmed, "traditional districting principles such as compactness, contiguity, and respect for political subdivisions" are not constitutionally required. *Shaw v. Reno,* — U.S. ——, ——, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993). Therefore, that the commission's plan might not be ideal is not a violation that the court can rectify in light of the required deference to legislative plans discussed above. *Upham,* 456 U.S. at 43, 102 S.Ct. at 1522. The "district court's modification of a state plan are limited to those necessary to cure any constitutional or statutory defects." *Id.*

### F.

Finally, the court notes that, although the coalition still objects to the county commission's September 13 districting plan, that plan achieves more of the goals of the coalition's alternative plans than does the August 4 joint plan embodied in the proposed consent decree. For instance, the City of Eufaula, which objected to the August 4 plan, does not object to the new September 13 plan. Furthermore, the Town of Clayton, which objected to the August 4 plan partially because it had been split in two, has had that concern resolved. In addition, because the September 13 plan must still be precleared and thus is being submitted as only an interim plan, the coalition will have another chance to press its objections, albeit in another forum. Finally, of course, the coalition can still lobby the county ·commission to adopt a new plan for the next election. If the coalition is correct in its claim that the majority of citizens in Barbour County oppose the September 13 plan, then political pressure can be exerted to redress those concerns. The plan approved today for the 1994 elections is not the final word on the Barbour County Commission.

### III. CONCLUSION

In conclusion, after considering the districting plan embodied in the plaintiffs' modi-

fication of the August 4 joint plan, the plan adopted by the county commission on September 13, the coalition's first alternative plan, and the coalition's second alternative plan, as well as the views of objectors, the court finds that it is required to adopt the commission's September 13 plan for the 1994 elections.

An appropriate judgment and injunction will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is entered in favor of the plaintiffs and against the defendants;

(2) That it is DECLARED that the current districting system used to elect the members of the Barbour County Commission violates the one-person, one-vote principle of the fourteenth amendment to the United States Constitution;

(3) That all outstanding objections to the districting plan passed by the Barbour County Commission on September 13, 1994, a copy of which is attached to this judgment, are overruled;

(4) That it is DECLARED that the districting plan passed by the Barbour County Commission on September 13, 1994, does not violate the one-person, one-vote and equal protection principles of the fourteenth amendment to the United States Constitution or vote dilution principles under § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973;

(5) That the court approves and adopts as an interim plan the districting plan passed by the Barbour County Commission on September 13, 1994; and

(6) That defendants Barbour County, Alabama and Probate Judge W. Mack Price, their officers, agents, servants, and employees, and those persons in active concert or

---

**17.** The court includes in this category the coalition's argument that it was not given adequate

opportunity to consult with the plaintiffs and the commission about the plan.

participation with them who receive actual notice of this order by personal service or otherwise, are each RESTRAINED and EN-JOINED:

(A) From using the current districting system for the Barbour County Commission in any future elections;

(B) From failing to implement and use for the 1994 elections the districting plan passed by the Barbour County Commission on September 13, 1994;

(C) From failing to conduct the 1994 elections for the Barbour County Commission under the following schedule: a qualifying deadline of September 30, 1994; a primary election on October 11, 1994; a run off election, if necessary, on October 25, 1994; and a general election on November 8, 1994;

(D) From failing to ensure that adequate notice is given with respect to the new districts and deadlines; and

(E) From failing to attempt forthwith to obtain preclearance of the September 13 districting plan pursuant to § 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c.

It is further ORDERED that defendants Barbour County, Alabama and Probate Judge W. Mack Price shall notify the court and all other parties forthwith of any decision regarding § 5 preclearance.

It is further ORDERED that the plaintiffs have and recover from defendants Barbour County, Alabama and Probate Judge W. Mack Price their reasonable attorney's fees and expenses, and that plaintiffs are allowed until October 14, 1994, to file their request for attorney's fees and expenses.

It is further ORDERED that costs are taxed against defendants Barbour County, Alabama and Probate Judge W. Mack Price, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.

## APPENDIX

Districting plan passed by Barbour County Commission on September 13, 1994

DB: ALABAMA District Statistics Date: 9/13/94
Total Populations, All Ages Time: 12:03 p.m.
Plan: Barbour Co Comm C Amend Mod Page: 1
Plan type: Barbour County Commission 7

| District Name | Number Members | Total Population | Ideal Population | District Variance | % District Variance |
|---|---|---|---|---|---|
| District 1 | 1 | 3,811 | 3,631 | 180 | 4.96% |
| District 2 | 1 | 3,811 | 3,631 | 180 | 4.96% |
| District 3 | 1 | 3,538 | 3,631 | −93 | −2.56% |
| District 4 | 1 | 3,521 | 3,631 | −110 | −3.03% |
| District 5 | 1 | 3,615 | 3,631 | −16 | −0.44% |
| District 6 | 1 | 3,654 | 3,631 | 23 | 0.63% |
| District 7 | 1 | 3,467 | 3,631 | −164 | −4.52% |
| Total | 7 | 25,417 | 25,417 | 0 | 0.00% |

PLANWIDE STATISTICS:
Range of populations: 3,467 to 3,811
Ratio range: 1.0992

Absolute range: −164 to 180
Absolute overall range: 344

Relative range: −4.52 to 4.96%
Relative overall range: 9.47%

Absolute mean deviation: 109.43
Relative mean deviation: 3.01%

Standard deviation: 127.1838

DB: ALABAMA District Summary Date: 9/13/94
Total Populations, All Ages Time: 12:02 p.m.
Plan: Barbour Co Comm C Amend Mod Page: 1
Plan type: Barbour County Commission 7

| District Name | Total Pop. | Total White | Total Black | Total Am. Ind. | Total Asian/PI | Total Other |
|---|---|---|---|---|---|---|
| District 1 | 3,811 | 1,207 | 2,599 | 3 | 0 | 2 |
| | 100.00% | 31.67% | 68.20% | 0.08% | 0.00% | 0.05% |
| District 2 | 3,811 | 2,764 | 1,022 | 13 | 9 | 3 |
| | 100.00% | 72.53% | 26.82% | 0.34% | 0.24% | 0.08% |
| District 3 | 3,538 | 1,185 | 2,332 | 7 | 14 | 0 |
| | 100.00% | 33.49% | 65.91% | 0.20% | 0.40% | 0.00% |
| District 4 | 3,521 | 2,894 | 609 | 2 | 6 | 10 |
| | 100.00% | 82.19% | 17.30% | 0.06% | 0.17% | 0.28% |
| District 5 | 3,615 | 2,651 | 945 | 6 | 13 | 0 |
| | 100.00% | 73.33% | 26.14% | 0.17% | 0.36% | 0.00% |
| District 6 | 3,654 | 1,264 | 2,378 | 10 | 2 | 0 |
| | 100.00% | 34.59% | 65.08% | 0.27% | 0.05% | 0.00% |
| District 7 | 3,467 | 2,153 | 1,309 | 5 | 0 | 0 |
| | 100.00% | 62.10% | 37.76% | 0.14% | 0.00% | 0.00% |
| Total | 25,417 | 14,118 | 11,194 | 46 | 44 | 15 |
| | 100.00% | 55.55% | 44.04% | 0.18% | 0.17% | 0.06% |

DB: ALABAMA District Summary Date: 9/13/94
Ethnic Breakdown of Voting Age Populations Time: 12:03 p.m.
Plan: Barbour Co Comm C Amend Mod Page: 1
Plan type: Barbour County Commission 7

| District Name | Total Vot. Age | Vot. Age White | Vot. Age Black | Vot. Age Am. Ind. | Vot. Age Asian/PI | Vot. Age Other |
|---|---|---|---|---|---|---|
| District 1 | 2,612 | 929 | 1,678 | 3 | 0 | 2 |
| | 100.00% | 35.57% | 64.24% | 0.11% | 0.00% | 0.08% |

# 1160

DB: ALABAMA · District Summary · Date: 9/13/94
Ethnic Breakdown of Voting Age Populations · Time: 12:03 p.m.

Plan: Barbour Co Comm C Amend Mod · Page: 1

Plan type: Barbour County Commission 7

| District Name | Total Vot. Age | Vot. Age White | Vot. Age Black | Vot. Age Am. Ind. | Vot. Age Asian/PI | Vot. Age Other |
|---|---|---|---|---|---|---|
| District 2 | 2,807 | 2,114 | 675 | 8 | 8 | 2 |
|  | 100.00% | 75.31% | 24.05% | 0.29% | 0.29% | 0.07% |
| District 3 | 2,559 | 958 | 1,588 | 3 | 10 | 0 |
|  | 100.00% | 37.44% | 62.06% | 0.12% | 0.39% | 0.00% |
| District 4 | 2,383 | 2,045 | 324 | 2 | 3 | 9 |
|  | 100.00% | 85.82% | 13.60% | 0.08% | 0.13% | 0.38% |
| District 5 | 2,550 | 1,980 | 557 | 6 | 7 | 0 |
|  | 100.00% | 77.65% | 21.84% | 0.24% | 0.27% | 0.00% |
| District 6 | 2,538 | 1,041 | 1,485 | 10 | 2 | 0 |
|  | 100.00% | 41.02% | 58.51% | 0.39% | 0.08% | 0.00% |
| District 7 | 2,504 | 1,677 | 823 | 4 | 0 | 0 |
|  | 100.00% | 66.97% | 32.87% | 0.16% | 0.00% | 0.00% |
| Total | 17,953 | 10,744 | 7,130 | 36 | 30 | 13 |
|  | 100.00% | 59.85% | 39.71% | 0.20% | 0.17% | 0.07% |

DB: ALABAMA · Place Population by District · Date: 9/13/94
Plan: Barbour Co Comm C Amend Mod · Total Populations, All Ages · Time: 1:31 p.m.

Page: 1

Plan type: Barbour County Commission 7

| Census Unit | Total Pop. | Total White | Total Black | Total Am. Ind. | Total Asian/PI | Total Other |
|---|---|---|---|---|---|---|
| **District 1** |  |  |  |  |  |  |
| Clayton town | 1,564 | 635 | 929 | 0 | 0 | 0 |
| Eufaula city | 1,309 | 363 | 943 | 1 | 0 | 2 |
| No Place Code | 938 | 209 | 727 | 2 | 0 | 0 |
| Total District 1 | 3,811 | 1,207 | 2,599 | 3 | 0 | 2 |
| **District 2** |  |  |  |  |  |  |
| Eufaula city | 2,864 | 2,527 | 315 | 11 | 9 | 2 |
| No Place Code | 947 | 237 | 707 | 2 | 0 | 1 |
| Total District 2 | 3,811 | 2,764 | 1,022 | 13 | 9 | 3 |
| **District 3** |  |  |  |  |  |  |
| Eufaula city | 3,538 | 1,185 | 2,332 | 7 | 14 | 0 |
| Total District 3 | 3,538 | 1,185 | 2,332 | 7 | 14 | 0 |
| **District 4** |  |  |  |  |  |  |
| Eufaula city | 3,521 | 2,894 | 609 | 2 | 6 | 10 |
| No Place Code | 0 | 0 | 0 | 0 | 0 | 0 |
| Total District 4 | 3,521 | 2,894 | 609 | 2 | 6 | 10 |
| **District 5** |  |  |  |  |  |  |
| Eufaula city | 1,988 | 1,616 | 357 | 2 | 13 | 0 |
| No Place Code | 1,627 | 1,035 | 588 | 4 | 0 | 0 |
| Total District 5 | 3,615 | 2,651 | 945 | 6 | 13 | 0 |
| **District 6** |  |  |  |  |  |  |
| Clio town | 1,365 | 573 | 783 | 7 | 2 | 0 |
| Louisville town | 728 | 389 | 339 | 0 | 0 | 0 |
| No Place Code | 1,561 | 302 | 1,256 | 3 | 0 | 0 |
| Total District 6 | 3,654 | 1,264 | 2,378 | 10 | 2 | 0 |
| **District 7** |  |  |  |  |  |  |
| Blue Springs town | 108 | 108 | 0 | 0 | 0 | 0 |
| No Place Code | 3,359 | 2,045 | 1,309 | 5 | 0 | 0 |
| Total District 7 | 3,467 | 2,153 | 1,309 | 5 | 0 | 0 |